Justice BREYER, concurring.
As I have previously said, I view this Court's doctrine referring to tiers of scrutiny as guidelines informing our approach to the case at hand, not tests to be mechanically applied. See, e.g., United States v. Alvarez,567 U.S. ----, ----, 132 S.Ct. 2537, 2551-2553, 183 L.Ed.2d 574 (2012)(BREYER, J., concurring in judgment); Nixon v. Shrink Missouri Government PAC,528 U.S. 377, 400-403, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000)(BREYER, J., concurring). On that understanding, I join the Court's opinion.
Justice GINSBURG, with whom Justice BREYERjoins as to Part II, concurring in part and concurring in the judgment.
I
I join the Court's opinion save for Part II. As explained in my dissenting opinion in Republican Party of Minnesota v. White,536 U.S. 765, 803, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002), I would not apply exacting scrutiny to a State's endeavor sensibly to "differentiate elections for political offices ..., from elections designed to select those whose office it is to administer justice without respect to persons," id.,at 805, 122 S.Ct. 2528.
II
I write separately to reiterate the substantial latitude, in my view, States should possess to enact campaign-finance rules geared to judicial elections. "Judges," the Court rightly recognizes, "are not politicians," ante,at 1662, so "States may regulate judicial elections differently than they regulate political elections," ante,at 1667. And because "the role of judges differs from the role of politicians," ibid., this Court's "precedents applying the First Amendment to political elections [should] have little bearing" on elections to judicial office. Ante, at 1667.
The Court's recent campaign-finance decisions, trained on political actors, should not hold sway for judicial elections. In Citizens United v. Federal Election Comm'n,558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), the Court invalidated a campaign-finance restriction designed to check the outsized influence of monied interests in politics. Addressing the Government's asserted interest in preventing "influence over or access to elected officials,"
*1674 id.,at 359, 130 S.Ct. 876the Court observed that "[f]avoritism and influence" are inevitable "in representative politics." Ibid.(quoting McConnell v. Federal Election Comm'n,540 U.S. 93, 297, 124 S.Ct. 619(KENNEDY, J., concurring in judgment in part and dissenting in part); emphasis added). A plurality of the Court responded similarly in McCutcheon v. Federal Election Comm'n,572 U.S. ----, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014), when it addressed the prospect that wealthy donors would have ready access to, and could therefore influence, elected policymakers. "[A] central feature of democracy," the plurality maintained, is "that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." Id.,at ----, 134 S.Ct., at 1441.
For reasons spelled out in the dissenting opinions in Citizens Unitedand McCutcheon,I would have upheld the legislation there at issue. But even if one agrees with those judgments, they are geared to elections for representative posts, and should have "little bearing" on judicial elections. Ante, at 1667. "Favoritism," i.e., partiality, if inevitable in the political arena, is disqualifying in the judiciary's domain. See Marshall v. Jerrico, Inc.,446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980)( "The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases."). Unlike politicians, judges are not "expected to be responsive to [the] concerns" of constituents. McCutcheon,572 U.S., at ----, 134 S.Ct., at 1441(plurality opinion). Instead, "it is the business of judges to be indifferent to popularity." Chisom v. Roemer,501 U.S. 380, 401, n. 29, 111 S.Ct. 2354, 115 L.Ed.2d 348 (1991)(internal quotation marks omitted).
States may therefore impose different campaign-finance rules for judicial elections than for political elections. Experience illustrates why States may wish to do so. When the political campaign-finance apparatus is applied to judicial elections, the distinction of judges from politicians dims. Donors, who gain audience and influence through contributions to political campaigns, anticipate that investment in campaigns for judicial office will yield similar returns. Elected judges understand this dynamic. As Ohio Supreme Court Justice Paul Pfeifer put it: "Whether they succeed or not," campaign contributors "mean to be buying a vote." Liptak & Roberts, Campaign Cash Mirrors a High Court's Rulings, N.Y. Times, Oct. 1, 2006, pp. A1, A22 (internal quotation marks omitted).
In recent years, moreover, issue-oriented organizations and political action committees have spent millions of dollars opposing the reelection of judges whose decisions do not tow a party line or are alleged to be out of step with public opinion. Following the Iowa Supreme Court's 2009 invalidation of the State's same-sex marriage ban, for example, national organizations poured money into a successful campaign to remove three justices from that Court. J. Shugerman, The People's Courts: Pursuing Judicial Independence in America 3 (2012). Attack advertisements funded by issue or politically driven organizations portrayed the justices as political actors; they lambasted the Iowa Supreme Court for "usurp[ing] the will of voters." A. Skaggs, M. da Silva, L. Casey, & C. Hall, The New Politics of Judicial Elections 2009-10, p. 9 (C. Hall ed. 2011) (internal quotation marks omitted).
Similarly portraying judges as belonging to another political branch, huge amounts have been spent on advertisements *1675 opposing retention of judges because they rendered unpopular decisions in favor of criminal defendants. D. Goldberg, S. Samis, E. Bender, & R. Weiss, The New Politics of Judicial Elections 2004, pp. 5, 10-11 (J. Rutledge ed. 2005) (hereinafter Goldberg). In North Carolina, for example, in 2014, a political action committee aired "a widely condemned TV spot accusing [North Carolina Supreme Court Justice Robin] Hudson of being 'soft' on child-molesters." Oliphant, When Judges Go Courting, National Journal Magazine, Oct. 18, 2014, p. 28. And in West Virginia, as described in Caperton v. A.T. Massey Coal Co.,556 U.S. 868, 873, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), coal executive Don Blankenship lavishly funded a political action committee called "And For The Sake Of The Kids." That group bought advertisements accusing Justice Warren McGraw of freeing a "child rapist" and allowing that "rapist" to "work as a janitor at a West Virginia school." Goldberg 4; see A. Bannon, E. Velasco, L. Casey, & L. Reagan, The New Politics of Judicial Elections 2011-12, p. 22 (L. Kinney and P. Hardin eds. 2013) (reporting that in 2011 and 2012, interest-oriented groups were 22 times more likely to purchase an "attack" advertisement than were judicial candidates themselves).
Disproportionate spending to influence court judgments threatens both the appearance and actuality of judicial independence. Numerous studies report that the money pressure groups spend on judicial elections "can affect judicial decision-making across a broad range of cases." Brief for Professors of Law, Economics, and Political Science as Amici Curiae14 (hereinafter Professors' Brief), see id.,at 5-17; J. Shepherd & M. Kang, Skewed Justice 1 (2014), available at http://skewedjustice.org (All Internet materials as visited Apr. 24, 2015, and included in Clerk of Court's case file) (finding that a recent "explosion in spending on television attack advertisements ... has made courts less likely to rule in favor of defendants in criminal appeals").
How does the electorate perceive outsized spending on judicial elections? Multiple surveys over the past 13 years indicate that voters overwhelmingly believe direct contributions to judges' campaigns have at least "some influence" on judicial decisionmaking. See Professors' Brief 23 (citing polls). Disquieting as well, in response to a recent poll, 87% of voters stated that advertisements purchased by interest groups during judicial elections can have either "some" or "a great deal of influence" on an elected "judge's later decisions." Justice at Stake/Brennan Center National Poll 3, Question 9 (Oct. 22-24, 2013) (conducted by 20/20 Insight LLC), available at http://www.justiceatstake.org/file.cfm/media/news/toplines337_B2D51323DC5D0. pdf.
"A State's decision to elect its judges does not require it to tolerate these risks." Ante,at 1668. What may be true of happy families, L. Tolstoy, Anna Karenina 1 (R. Pevear and L. Volokhonsky transls. 2000) ("All happy families are alike"), or of roses, G. Stein, Sacred Emily, in Geography and Plays 178, 187 (1922) (reprint 1968) ("Rose is a rose is a rose is a rose"), does not hold true in elections of every kind. States should not be put to the polar choices of either equating judicial elections to political elections, or else abandoning public participation in the selection of judges altogether. Instead, States should have leeway to "balance the constitutional interests in judicial integrity and free expression within the unique setting of an elected judiciary." White,536 U.S., at 821, 122 S.Ct. 2528(GINSBURG, J., dissenting).
Justice SCALIA, with whom Justice THOMASjoins, dissenting.
An ethics canon adopted by the Florida Supreme Court bans a candidate in a judicial *1676 election from asking anyone, under any circumstances, for a contribution to his campaign. Faithful application of our precedents would have made short work of this wildly disproportionate restriction upon speech. Intent upon upholding the Canon, however, the Court flattens one settled First Amendment principle after another.
I
The first axiom of the First Amendment is this: As a general rule, the state has no power to ban speech on the basis of its content. One need not equate judges with politicians to see that this principle does not grow weaker merely because the censored speech is a judicial candidate's request for a campaign contribution. Our cases hold that speech enjoys the full protection of the First Amendment unless a widespread and longstanding tradition ratifies its regulation. Brown v. Entertainment Merchants Assn.,564 U.S. ----, ----, 131 S.Ct. 2729, 2733-2734, 180 L.Ed.2d 708 (2011). No such tradition looms here. Georgia became the first State to elect its judges in 1812, and judicial elections had spread to a large majority of the States by the time of the Civil War.Republican Party of Minn. v. White,536 U.S. 765, 785, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002). Yet there appears to have been no regulation of judicial candidates' speech throughout the 19th and early 20th centuries. Ibid.The American Bar Association first proposed ethics rules concerning speech of judicial candidates in 1924, but these rules did not achieve widespread adoption until after the Second World War. Id.,at 786, 122 S.Ct. 2528.
Rules against soliciting campaign contributions arrived more recently still. The ABA first proposed a canon advising against it in 1972, and a canon prohibiting it only in 1990. See Brief for American Bar Association as Amicus Curiae2-4. Even now, 9 of the 39 States that elect judges allow judicial candidates to ask for campaign contributions. See id.,at 4. In the absence of any long-settled custom about judicial candidates' speech in general or their solicitations in particular, we have no basis for relaxing the rules that normally apply to laws that suppress speech because of content.
One likewise need not equate judges with politicians to see that the electoral setting calls for all the more vigilance in ensuring observance of the First Amendment. When a candidate asks someone for a campaign contribution, he tends (as the principal opinion acknowledges) also to talk about his qualifications for office and his views on public issues. Ante,at 1664 - 1665 (plurality opinion). This expression lies at the heart of what the First Amendment is meant to protect. In addition, banning candidates from asking for money personally "favors some candidates over others-incumbent judges (who benefit from their current status) over non-judicial candidates, the well-to-do (who may not need to raise any money at all) over lower-income candidates, and the well-connected (who have an army of potential fundraisers) over outsiders." Carey v. Wolnitzek,614 F.3d 189, 204 (C.A.6 2010). This danger of legislated (or judicially imposed) favoritism is the very reason the First Amendment exists.
Because Canon 7C(1) restricts fully protected speech on the basis of content, it presumptively violates the First Amendment. We may uphold it only if the State meets its burden of showing that the Canon survives strict scrutiny-that is to say, only if it shows that the Canon is narrowly tailored to serve a compelling interest. I do not for a moment question the Court's conclusion that States have different compelling *1677 interests when regulating judicial elections than when regulating political ones. Unlike a legislator, a judge must be impartial-without bias for or against any party or attorney who comes before him. I accept for the sake of argument that States have a compelling interest in ensuring that its judges are seento be impartial. I will likewise assume that a judicial candidate's request to a litigant or attorney presents a danger of coercion that a political candidate's request to a constituent does not. But Canon 7C(1) does not narrowly target concerns about impartiality or its appearance; it applies even when the person asked for a financial contribution has no chance of ever appearing in the candidate's court. And Florida does not invoke concerns about coercion, presumably because the Canon bans solicitations regardless of whether their object is a lawyer, litigant, or other person vulnerable to judicial pressure. So Canon 7C(1) fails exacting scrutiny and infringes the First Amendment. This case should have been just that straightforward.
II
The Court concludes that Florida may prohibit personal solicitations by judicial candidates as a means of preserving "public confidence in the integrity of the judiciary." Ante,at 1666. It purports to reach this destination by applying strict scrutiny, but it would be more accurate to say that it does so by applying the appearance of strict scrutiny.
A
The first sign that mischief is afoot comes when the Court describes Florida's compelling interest. The State must first identify its objective with precision before one can tell whether that interest is compelling and whether the speech restriction narrowly targets it. In White,for example, the Court did not allow a State to invoke hazy concerns about judicial impartiality in justification of an ethics rule against judicial candidates' announcing their positions on legal issues. 536 U.S., at 775, 122 S.Ct. 2528. The Court instead separately analyzed the State's concerns about judges' bias against parties, preconceptions on legal issues, and openmindedness, and explained why each concern (and each for a different reason) did not suffice to sustain the rule. Id.,at 775-780, 122 S.Ct. 2528.
In stark contrast to White,the Court today relies on Florida's invocation of an ill-defined interest in "public confidence in judicial integrity." The Court at first suggests that "judicial integrity" involves the "ability to administer justice without fear or favor." Ante,at 1666. As its opinion unfolds, however, today's concept of judicial integrity turns out to be "a mere thing of wax in the hands of the judiciary, which they may twist, and shape into any form they please." 12 The Works of Thomas Jefferson 137 (P. Ford ed. 1905). When the Court explains how solicitation undermines confidence in judicial integrity, integrity starts to sound like saintliness. It involves independence from any " 'possibletemptation' " that " 'mightlead' " the judge, "even unknowingly," to favor one party. Ante,at 1667 (emphasis added). When the Court turns to distinguishing in-person solicitation from solicitation by proxy, the any-possible-temptation standard no longer helps and thus drops out. The critical factors instead become the "pressure" a listener feels during a solicitation and the "appearance that the candidate will remember who says yes, and who says no." Ante,at 1669. But when it comes time to explain Florida's decision to allow candidates to write thank-you notes, the "appearance that the candidate ... remember[s] who says yes" gets nary a mention. Ante,at 1669. And when the *1678 Court confronts Florida's decision to prohibit mass-mailed solicitations, concern about pressure fades away. Ante,at 1671. More outrageous still, the Court at times molds the interest in the perception that judges have integrity into an interest in the perception that judges do not solicit-for example when it says, "all personal solicitations by judicial candidates create a public appearance that undermines confidence in the integrity of the judiciary; banning all personal solicitations by judicial candidates is narrowly tailored to address that concern." Ante,at 1671. This is not strict scrutiny; it is sleight of hand.
B
The Court's twistifications have not come to an end; indeed, they are just beginning. In order to uphold Canon 7C(1) under strict scrutiny, Florida must do more than point to a vital public objective brooding overhead. The State must also meet a difficult burden of demonstrating that the speech restriction substantially advances the claimed objective. The State "bears the risk of uncertainty," so "ambiguous proof will not suffice." Entertainment Merchants,564 U.S., at ----, 131 S.Ct., at 2739. In an arresting illustration, this Court held that a law punishing lies about winning military decorations like the Congressional Medal of Honor failed exacting scrutiny, because the Government could not satisfy its "heavy burden" of proving that "the public's general perception of military awards is diluted by false claims." United States v. Alvarez,567 U.S. ----, ----, 132 S.Ct. 2537, 2549, 183 L.Ed.2d 574 (2012)(plurality opinion).
Now that we have a case about the public's perception of judicial honor rather than its perception of military honors, the Justices of this Court change the rules. The Court announces, on the basis of its "intuiti[on]," that allowing personal solicitations will make litigants worry that " 'judges' decisions may be motivated by the desire to repay campaign contributions.' " Ante,at 1667. But this case is not about whether Yulee has the right to receive campaign contributions. It is about whether she has the right to askfor campaign contributions that Florida's statutory law already allows her to receive. Florida bears the burden of showing that banning requestsfor lawful contributions will improve public confidence in judges-not just a little bit, but significantly, because "the Government does not have a compelling interest in each marginal percentage point by which its goals are advanced." Entertainment Merchants, supra,at ----, n. 9, 131 S.Ct., at 2741, n. 9.
Neither the Court nor the State identifies the slightest evidence that banning requests for contributions will substantially improve public trust in judges. Nor does common sense make this happy forecast obvious. The concept of judicial integrity "dates back at least eight centuries," ante,at 1666, and judicial elections in America date back more than two centuries, supra,at 1676-but rules against personal solicitations date back only to 1972, supra,at 1676. The peaceful coexistence of judicial elections and personal solicitations for most of our history calls into doubt any claim that allowing personal solicitations would imperil public faith in judges. Many States allow judicial candidates to ask for contributions even today, but nobody suggests that public confidence in judges fares worse in these jurisdictions than elsewhere. And in any event, if candidates' appeals for money are " 'characteristically intertwined' " with discussion of qualifications and views on public issues, ante,at 1665 (plurality opinion), how can the Court be so sure that the public will regard them as improprieties rather than as legitimate instances of campaigning? In the final analysis, Florida comes nowhere *1679 near making the convincing demonstration required by our cases that the speech restriction in this case substantially advances its objective.
C
But suppose we play along with the premise that prohibiting solicitations will significantly improve the public reputation of judges. Even then, Florida must show that the ban restricts no more speech than necessary to achieve the objective. See Sable Communications of Cal., Inc. v. FCC,492 U.S. 115, 126, 109 S.Ct. 2829, 106 L.Ed.2d 93 (1989).
Canon 7C(1) falls miles short of satisfying this requirement. The Court seems to accept Florida's claim that solicitations erode public confidence by creating the perception that judges are selling justice to lawyers and litigants. Ante,at 1666. Yet the Canon prohibits candidates from asking for money from anybody-even from someone who is neither lawyer nor litigant, even from someone who (because of recusal rules) cannot possibly appear before the candidate as lawyer or litigant. Yulee thus may not call up an old friend, a cousin, or even her parents to ask for a donation to her campaign. The State has not come up with a plausible explanation of how soliciting someone who has no chance of appearing in the candidate's court will diminish public confidence in judges.
No less important, Canon 7C(1) bans candidates from asking for contributions even in messages that do not target any listener in particular-mass-mailed letters, flyers posted on telephone poles, speeches to large gatherings, and Web sites addressed to the general public. Messages like these do not share the features that lead the Court to pronounce personal solicitations a menace to public confidence in the judiciary. Consider online solicitations. They avoid " 'the spectacle of lawyers or potential litigants directly handing over money to judicial candidates,' " ante,at 1667. People who come across online solicitations do not feel "pressure" to comply with the request, ante,at 1669. Nor does the candidate's signature on the online solicitation suggest "that the candidate will remember who says yes, and who says no," ibid.Yet Canon 7C(1) prohibits these and similar solicitations anyway. This tailoring is as narrow as the Court's scrutiny is strict.
Perhaps sensing the fragility of the initial claim that allsolicitations threaten public confidence in judges, the Court argues that "the lines Yulee asks [it] to draw are unworkable." Ante,at 1671. That is a difficulty of the Court's own imagination. In reality, the Court could have chosen from a whole spectrum of workable rules. It could have held that States may regulate no more than solicitation of participants in pending cases, or solicitation of people who are likely to appear in the candidate's court, or even solicitation of any lawyer or litigant. And it could have ruled that candidates have the right to make fundraising appeals that are not directed to any particular listener (like requests in mass-mailed letters), or at least fundraising appeals plainly directed to the general public (like requests placed online). The Supreme Court of Florida has made similar accommodations in other settings. It allows sitting judges to solicit memberships in civic organizations if (among other things) the solicitee is not "likely ever to appear before the court on which the judge serves." Code of Judicial Conduct for the State of Florida 23 (2014) (Judicial Conduct Code). And it allows sitting judges to accept gifts if (among other things) "the donor is not a party or other person ... whose interests have come or are likely to come before the judge." Id.,at 24. It is not too much to *1680 ask that the State show election speech similar consideration.
The Court's accusation of unworkability also suffers from a bit of a pot-kettle problem. Consider the many real-world questions left open by today's decision. Does the First Amendment permit restricting a candidate's appearing at an event where somebody elseasks for campaign funds on his behalf? See Florida Judicial Ethics Advisory Committee Opinion No. 2012-14 (JEAC Op.). Does it permit prohibiting the candidate's familyfrom making personal solicitations? See ibid.Does it allow prohibiting the candidate from participating in the creation of a Web site that solicits funds, even if the candidate's name does not appear next to the request? See JEAC Op. No. 2008-11. More broadly, could Florida ban thank-you notes to donors? Cap a candidate's campaign spending? Restrict independent spending by people other than the candidate? Ban independent spending by corporations? And how, by the way, are judges supposed to decide whether these measures promote public confidence in judicial integrity, when the Court does not even have a consistent theory about what it means by "judicial integrity"? For the Court to wring its hands about workability under these circumstances is more than one should have to bear.
D
Even if Florida could show that banning all personal appeals for campaign funds is necessary to protect public confidence in judicial integrity, the Court must overpower one last sentinel of free speech before it can uphold Canon 7C(1). Among its other functions, the First Amendment is a kind of Equal Protection Clause for ideas. The state ordinarily may not regulate one message because it harms a government interest yet refuse to regulate other messages that impair the interest in a comparable way. Applying this principle, we invalidated a law that prohibited picketing dwellings but made an exception for picketing about labor issues; the State could not show that labor picketing harmed its asserted interest in residential privacy any less than other kinds of picketing. Carey v. Brown,447 U.S. 455, 464-465, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980). In another case, we set aside a ban on showing movies containing nudity in drive-in theaters, because the government did not demonstrate that movies with nude scenes would distract passing drivers any more than, say, movies with violent scenes. Erznoznik v. Jacksonville,422 U.S. 205, 214-215, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975).
The Court's decision disregards these principles. The Court tells us that "all personal solicitations by judicial candidates create a public appearance that undermines confidence in the integrity of the judiciary." Ante,at 1671. But Canon 7C(1) does not restrict allpersonal solicitations; it restricts only personal solicitations related to campaigns. The part of the Canon challenged here prohibits personal pleas for "campaign funds," and the Canon elsewhere prohibits personal appeals to attorneys for "publicly stated support." Judicial Conduct Code 38. So although Canon 7C(1) prevents Yulee from asking a lawyer for a few dollars to help her buy campaign pamphlets, it does not prevent her asking the same lawyer for a personal loan, access to his law firm's luxury suite at the local football stadium, or even a donation to help her fight the Florida Bar's charges. What could possibly justify these distinctions? Surely the Court does not believe that requests for campaign favors erode public confidence in a way that requests for favors unrelated to elections do not. Could anyone say with a straight face that it looks worsefor a *1681 candidate to say "please give my campaign $25" than to say "please give me$25"?*
Fumbling around for a fig-leaf, the Court says that "the First Amendment imposes no freestanding 'underinclusiveness limitation.' " Ante,at 1668. This analysis elides the distinction between selectivity on the basis of content and selectivity on other grounds. Because the First Amendment does not prohibit underinclusiveness as such, lawmakers may target a problem only at certain times or in certain places. Because the First Amendment doesprohibit content discrimination as such, lawmakers may nottarget a problem only in certain messages. Explaining this distinction, we have said that the First Amendment would allow banning obscenity "only in certain media or markets" but would preclude banning "only that obscenity which includes offensive political messages." R.A.V. v. St. Paul,505 U.S. 377, 387-388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)(emphasis deleted). This case involves selectivity on the basis of content. The Florida Supreme Court has decided to eliminate the appearances associated with "personal appeals for money," ante,at 1671, when the appeals seek money for a campaign but not when the appeals seek money for other purposes. That distinction violates the First Amendment. See Erznoznik, supra,at 215, 95 S.Ct. 2268.
Even on the Court's own terms, Canon 7C(1) cannot stand. The Court concedes that "underinclusiveness can raise 'doubts about whether the government is in fact pursuing the interest it invokes.' " Ante,at 1668. Canon 7C(1)'s scope suggests that it has nothing to do with the appearances created by judges' asking for money, and everything to do with hostility toward judicial campaigning. How else to explain the Florida Supreme Court's decision to ban allpersonal appeals for campaign funds (even when the solicitee could never appear before the candidate), but to tolerate appeals for other kinds of funds (even when the solicitee will surely appear before the candidate)? It should come as no surprise that the ABA, whose model rules the Florida Supreme Court followed when framing Canon 7C(1), opposes judicial elections-preferring instead a system in which (surprise!) a committee of lawyers proposes candidates from among whom the Governor must make his selection. See White,536 U.S., at 787, 122 S.Ct. 2528.
The Court tries to strike a pose of neutrality between appointment and election of judges, but no one should be deceived. A Court that sees impropriety in a candidate's request for anycontributions to his election campaign does not much like judicial selection by the people. One cannot have judicial elections without judicial campaigns, and judicial campaigns without funds for campaigning, and funds for campaigning without asking for them. When a society decides that its judges should be elected, it necessarily decides that selection by the people is more important than the oracular sanctity of judges, their immunity from the (shudder!) indignity of begging for funds, and their exemption from those shadows of impropriety that *1682 fall over the proletarian public officials who must run for office. A free society, accustomed to electing its rulers, does not much care whether the rulers operate through statute and executive order, or through judicial distortion of statute, executive order, and constitution. The prescription that judges be elected probably springs from the people's realization that their judges can become their rulers-and (it must be said) from just a deep-down feeling that members of the Third Branch will profit from a hearty helping of humble pie, and from a severe reduction of their great remove from the (ugh!) People. (It should not be thought that I myself harbor such irreverent and revolutionary feelings; but I think it likely-and year by year more likely-that those who favor the election of judges do so.) In any case, hostility to campaigning by judges entitles the people of Florida to amend their Constitution to replace judicial elections with the selection of judges by lawyers' committees; it does not entitle the Florida Supreme Court to adopt, or this Court to endorse, a rule of judicial conduct that abridges candidates' speech in the judicial elections that the Florida Constitution prescribes.
* * *
This Court has not been shy to enforce the First Amendment in recent Terms-even in cases that do not involve election speech. It has accorded robust protection to depictions of animal torture, sale of violent video games to children, and lies about having won military medals. See United States v. Stevens,559 U.S. 460, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010); Entertainment Merchants, 564 U.S. ----, 131 S.Ct. 2729, 180 L.Ed.2d 708; Alvarez,567 U.S. ----, 132 S.Ct. 2537, 183 L.Ed.2d 574. Who would have thought that the same Court would today exert such heroic efforts to save so plain an abridgement of the freedom of speech? It is no great mystery what is going on here. The judges of this Court, like the judges of the Supreme Court of Florida who promulgated Canon 7C(1), evidently consider the preservation of public respect for the courts a policy objective of the highest order. So it is-but so too are preventing animal torture, protecting the innocence of children, and honoring valiant soldiers. The Court did not relax the Constitution's guarantee of freedom of speech when legislatures pursued those goals; it should not relax the guarantee when the Supreme Court of Florida pursues this one. The First Amendment is not abridged for the benefit of the Brotherhood of the Robe.
I respectfully dissent.

Neither Florida nor the Court identifies any other ethics rule that would prevent candidates like Yulee from asking for favors unrelated to elections, and I know of none. The Supreme Court of Florida has adopted various rules restricting sitting judges'solicitation and acceptance of favors, but these rules do not bind challengers like Yulee. See, e.g.,Canon 4D(2)(a), Judicial Conduct Code 18-19 ("A judge as [a member or officer of an organization] ... shall not personally or directly participate in the solicitation of funds ..."); Canon 5D(5), id.,at 24 ("A judge shall not accept ... a gift, bequest, favor or loan ..."); JEAC Op. No. 2010-14 ("[J]udicial candidates are only governed by Canon 7, and not by the remainder of the Code of Judicial Conduct").