*788 Justice Scalia
delivered the opinion of the Court.
We consider whether a California law imposing restrictions on violent video games comports with the First Amendment.
*789 California Assembly Bill 1179 (2005), Cal. Civ. Code Ann. §§ 1746-1746.5 (West 2009) (Act), prohibits the sale or rental of “violent video games” to minors, and requires their packaging to be labeled “18.” The Act covers games “in which the range of options available to a player includes killing, maiming, dismembering, or sexually assaulting an image of a human being, if those acts are depicted” in a manner that “[a] reasonable person, considering the game as a whole, would find appeals to a deviant or morbid interest of minors,” that is “patently offensive to prevailing standards in the community as to what is suitable for minors,” and that “causes the game, as a whole, to lack serious literary, artistic, political, or scientific value for minors.” § 1746(d)(1)(A). Violation of the Act is punishable by a civil fine of up to $1,000. §1746.3.
Respondents, representing the video-game and software industries, brought a preenforcement challenge to the Act in the United States District Court for the Northern District
H-1 *790 of California. That court concluded that the Act violated the First Amendment and permanently enjoined its enforcement. Video Software Dealers Assn. v. Schwarzenegger, No. C-05-04188 RMW (2007), App. to Pet. for Cert. 39a. The Court of Appeals affirmed, Video Software Dealers Assn. v. Schwarzenegger, 556 F. 3d 950 (CA9 2009), and we granted certiorari, 559 U. S. 1092 (2010).
II
California correctly acknowledges that video games qualify for First Amendment protection. The Free Speech Clause exists principally to protect discourse on public matters, but we have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try. “Everyone is familiar with instances of propaganda through fiction. What is one man’s amusement, teaches another’s doctrine.” Winters v. New York, 333 U. S. 507, 510 (1948). Like the protected books, plays, and movies that preceded them, video games communicate ideas — and even social messages — through many familiar literary devices (such as characters, dialogue, plot, and music) and through features distinctive to the medium (such as the player’s interaction with -the virtual world). That suffices to confer First Amendment protection. Under our Constitution, “esthetic and moral judgments about art and literature . . . are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority.” United States v. Playboy Entertainment Group, Inc., 529 U. S. 803, 818 (2000). And whatever the challenges of applying the Constitution to ever-advancing technology, “the basic principles of freedom of speech and the press, like the First Amendment’s command, do not vary” when a new and different medium for communication appears. Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495, 503 (1952).
The most basic of those principles is this: “[A]s a general matter, . . . government has no power to restrict expression *791 because of its message, its ideas, its subject matter, or its content.” Ashcroft v. American Civil Liberties Union, 535 U. S. 564, 573 (2002) (internal quotation marks omitted). There are of course exceptions. “‘From 1791 to the present/ ... the First Amendment has ‘permitted restrictions upon the content of speech in a few limited areas/ and has never ‘include[d] a freedom to disregard these traditional limitations.’ ” United States v. Stevens, 559 U. S. 460, 468 (2010) (quoting R. A. V. v. St. Paul, 505 U. S. 377, 382-383 (1992)). These limited areas — such as obscenity, Roth v. United States, 354 U. S. 476, 483 (1957), incitement, Brandenburg v. Ohio, 395 U. S. 444, 447-449 (1969) (per curiam), and fighting words, Chaplinsky v. New Hampshire, 315 U. S. 568, 572 (1942)—represent “well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem,” id., at 571-572.
Last Term, in Stevens, we held that new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated. Stevens concerned a federal statute purporting to criminalize the creation, sale, or possession of certain depictions of animal cruelty. See 18 U. S. C. § 48 (amended 2010). The statute covered depictions “in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed” if that harm to the animal was illegal where “the creation, sale, or possession t[ook] place,” § 48(e)(1). A saving clause largely borrowed from our obscenity jurisprudence, see Miller v. California, 413 U. S. 15, 24 (1973), exempted depictions with “serious religious, political, scientific, educational, journalistic, historical, or artistic value,” § 48(b). We held that statute to be an impermissible content-based restriction on speech. There was no American tradition of forbidding the depiction of animal cruelty — though States have long had laws against committing it.
*792 The Government argued in Stevens that lack of a historical warrant did not matter; that it could create new categories of unprotected speech by applying a “simple balancing test” that weighs the value of a particular category of speech against its social costs and then punishes that category of speech if it fails the test. Stevens, 559 U. S., at 470. We emphatically rejected that “startling and dangerous” proposition. Ibid. “Maybe there are some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law.” Id., at 472. But without persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription, a legislature may not revise the “judgment [of] the American people,” embodied in the First Amendment, “that the benefits of its restrictions on the Government outweigh the costs.” Id., at 470.
That holding controls this case.[1] As in Stevens, California has tried to make violent-speech regulation look like obscenity regulation by appending a saving clause required for the latter. That does not suffice. Our cases have been clear that the obscenity exception to the First Amendment does *793 not cover whatever a legislature finds shocking, but only depictions of “sexual conduct,” Miller, supra, at 24. See also Cohen v. California, 403 U. S. 15, 20 (1971); Roth, supra, at 487, and n. 20.
Stevens was not the first time we have encountered and rejected a State’s attempt to shoehorn speech about violence into obscenity. In Winters, we considered a New York criminal statute “forbid[ding] the massing of stories of bloodshed and lust in such a way as to incite to crime against the person,” 333 U. S., at 514. The New York Court of Appeals upheld the provision as a law against obscenity. “[T]here can be no more precise test of written indecency or obscenity,” it said, “than the continuing and changeable experience of the community as to what types of books are likely to bring about the corruption of public morals or other analogous injury to the public order. ” Ibid, (internal quotation marks omitted). That is of course the same expansive view of governmental power to abridge the freedom of speech based on interest balancing that we rejected in Stevens. Our opinion in Winters, which concluded that the New York statute failed a heightened vagueness standard applicable to restrictions upon speech entitled to First Amendment protection, 333 U. S., at 517-519, made clear that violence is not part of the obscenity that the Constitution permits to be regulated. The speech reached by the statute contained “no indecency or obscenity in any sense heretofore known to the law.” Id., at 519.
Because speech about violence is not obscene, it is of no consequence that California’s statute mimics the New York statute regulating obscenity for minors that we upheld in Ginsberg v. New York, 390 U. S. 629 (1968). That case approved a prohibition on the sale to minors of sexual material that would be obscene from the perspective of a child.[2] We *794 held that the legislature could “adjus[t] the definition of obscenity 'to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests ... ’ of... minors.” Id., at 638 (quoting Mishkin v. New York, 383 U. S. 502, 509 (1966)). And because “obscenity is not protected expression,” the New York statute could be sustained so long as the legislature’s judgment that the proscribed materials were harmful to children “was not irrational.” 390 U. S., at 641.
The California Act is something else entirely. It does not adjust the boundaries of an existing category of unprotected speech to ensure that a definition designed for adults is not uncritically applied to children. California does not argue that it is empowered to prohibit selling offensively violent works to adults — and it is wise not to, since that is but a hair’s breadth from the argument rejected in Stevens. Instead, it wishes to create a wholly new category of content-based regulation that is permissible only for speech directed at children.
That is unprecedented and mistaken. “[Mjinors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them.” Erznoznik v. Jacksonville, 422 U. S. 205, 212-213 (1975) (citation omitted). No doubt a State possesses legitimate power to protect children from harm, Ginsberg, supra, at 640-641; Prince v. Massachusetts, 321 U. S. 158, 165 (1944), but that does not include a free-floating power to restrict the ideas to which children may be ex *795 posed. “Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.” Erznoznik, supra, at 213-214.[3]
California’s argument would fare better if there were a longstanding tradition in this country of specially restricting children’s access to depictions of violence, but there is none. Certainly the books we give children to read — or read to *796 them when they are younger — contain no shortage of gore. Grimm’s Fairy Tales, for example, are grim indeed. As her just deserts for trying to poison Snow White, the wicked queen is made to dance in red hot slippers “till she fell dead on the floor, a sad example of envy and jealousy.” The Complete Brothers Grimm Fairy Tales 198 (2006 ed.). Cinderella’s evil stepsisters have their eyes pecked out by doves. Id., at 95. And Hansel and Gretel (children!) kill their captor by baking her in an oven. Id., at 54.
High-school reading lists are full of similar fare. Homer’s Odysseus blinds Polyphemus the Cyclops by grinding out his eye with a heated stake. 22 The Odyssey of Homer, Book IX, p. 125 (S. Butcher & A. Lang transis. 1909) (“Even so did we seize the fiery-pointed brand and whirled it round in his eye, and the blood flowed about the heated bar. And the breath of the flame singed his eyelids and brows all about, as the ball of the eye burnt away, and the roots thereof crackled in the flame”). In the Inferno, Dante and Virgil watch corrupt politicians struggle to stay submerged beneath a lake of boiling pitch, lest they be skewered by devils above the surface. Canto XXI, pp. 187-189 (A. Mandelbaum transl. Bantam Classic ed. 1982). And Golding’s Lord of the-Flies recounts how a schoolboy called Piggy is savagely murdered by other children while marooned on an island. W. Golding, Lord of the Flies 208-209 (1997 ed.).[4]
*797 This is not to say that minors’ consumption of violent entertainment has never encountered resistance. In the 1800’s, dime novels depicting crime and “penny dreadfuls” (named for their price and content) were blamed in some quarters for juvenile delinquency. See Brief for Cato Institute as Amicus Curiae 6-7. When motion pictures came along, they became the villains instead. “The days when the police looked upon dime novels as the most dangerous of textbooks in the school for crime are drawing to a close.... They say that the moving picture machine . . . tends even more than did the dime novel to turn the thoughts of the easily influenced to paths which sometimes lead to prison.” Moving Pictures as Helps to Crime, N. Y. Times, Feb. 21, 1909, quoted in Brief for Cato Institute 8. For a time, our Court did permit broad censorship of movies because of their capacity to be “used for evil,” see Mutual Film Corp. v. Industrial Comm’n of Ohio, 236 U. S. 230, 242 (1915), but we eventually reversed course, Joseph Burstyn, Inc., 343 U. S., at 502; see also Erznoznik, supra, at 212-214 (invalidating a drive-in movies restriction designed to protect children). Radio dramas were next, and then came comic books. Brief for Cato Institute 10-11. Many in the late 1940’s and early 1950’s blamed comic books for fostering a “preoccupation with violence and horror” among the young, leading to a rising juvenile crime rate. See Note, Regulation of Comic Books, 68 Harv. L. Rev. 489, 490 (1955). But efforts to convince Congress to restrict comic books failed. Brief for Comic Book Legal Defense Fund as Amicus Curiae 11-15.[5] *798 And, of course, after comic books came television and music lyrics.
California claims that video games present special problems because they are “interactive,” in that the player participates in the violent action on screen and determines its outcome. The latter feature is nothing new: Since at least the publication of The Adventures of You: Sugarcane Island in 1969, young readers of choose-your-own-adventure stories have been able to make decisions that determine the plot by following instructions about which page to turn to. Cf. Interactive Digital Software Assn. v. St. Louis County, 329 F. 3d 954, 957-958 (CA8 2003). As for the argument that video games enable participation in the violent action, that seems to us more a matter of degree than of kind. As Judge Posner has observed, all literature is interactive. “[T]he better it is, the more interactive. Literature when it is successful draws the reader into the story, makes him identify with the characters, invites him to judge them and quarrel with them, to experience their joys and sufferings as the reader’s own.” American Amusement Machine Assn. v. Kendrick, 244 F. 3d 572, 577 (CA7 2001) (striking down a similar restriction on violent video games).
Justice Alito has done considerable independent research to identify, see post, at 818-819, nn. 13-18, video games in which “the violence is astounding,” post, at 818. “Victims are dismembered, decapitated, disemboweled, set on fire, and chopped into little pieces_Blood gushes, splatters, and pools.” Ibid. Justice Alito recounts all these disgusting video games in order to disgust us — but disgust is not a valid basis for restricting expression. And the same is true of Justice Alito’s description, post, at 819, of those
*799 Because the Act imposes a restriction on the content of protected speech, it is invalid unless California can demonstrate that it passes strict scrutiny — that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest. R. A. V., 505 U. S., at 395. The State must specifically identify an “actual problem” in need of solving, Playboy, 529 U. S., at 822-823, and the curtailment of free speech must be actually necessary to the solution, see R. A. V, supra, at 395. That is a demanding standard. “It is rare that a regulation restricting speech because of its content will ever be permissible.” Playboy, supra, at 818.
California cannot meet that standard. At the outset, it acknowledges that it cannot show a direct causal link between violent video games and harm to minors. Rather, relying upon our decision in Turner Broadcasting System, Inc. v. FCC, 512 U. S. 622 (1994), the State claims that it need not produce such proof because the legislature can make a predictive judgment that such a link exists, based on competing psychological studies. But reliance on Turner Broadcasting is misplaced. That decision applied intermediate scrutiny to a content-neutral regulation. Id., at 661-662. California’s burden is much higher, and because it bears the video games he has discovered that have a racial or ethnic motive for their violence — “‘ethnic cleansing’ [of] . . . African-Americans, Latinos, or Jews.” To what end does he relate this? Does it somehow increase the “aggressiveness” that- California wishes to suppress? Who knows? But it does arouse the reader’s ire, and the reader’s desire to put an end to this horrible message. Thus, ironically, Justice Alito’s argument highlights the precise danger posed by the California Act: that the ideas expressed by speech — whether it be violence, or' gore, or racism — and not its objective effects, may be the real reason for governmental proscription.
III *800 risk of uncertainty, see Playboy, supra, at 816-817, ambiguous proof will not suffice.
The State’s evidence is not compelling. California relies primarily on the research of Dr. Craig Anderson and a few other research psychologists whose studies purport to show a connection between exposure to violent video games and harmful effects on children. These studies have been rejected by every court to consider them,[6] and with good reason: They do not prove that violent video games cause minors to act aggressively (which would at least be a beginning). Instead, “[njearly all of the research is based on correlation, not evidence of causation, and most of the studies suffer from significant, admitted flaws in methodology.” 556 F. 3d, at 964. They show at best some correlation between exposure to violent entertainment and minuscule real-world effects, such as children’s feeling more aggressive or making louder noises in the few minutes after playing a violent game than after playing a nonviolent game.[7]
Even taking for granted Dr. Anderson’s conclusions that violent video games produce some effect on children’s feelings of aggression, those effects are both small and indistin *801 guishable from effects produced by other media. In his testimony in a similar lawsuit, Dr. Anderson admitted that the “effect sizes” of children’s exposure to violent video games are “about the same” as that produced by their exposure to violence on television. App. 1263. And he admits that the same effects have been found when children watch cartoons starring Bugs Bunny or the Road Runner, id., at 1304, or when they play video games like Sonic the Hedgehog that are rated “E” (appropriate for all ages), id., at 1270, or even when they “vie[w] a picture of a gun,” id., at 1315-1316.[8]
Of course, California has (wisely) declined to restrict Saturday morning cartoons, the sale of games rated for young *802 children, or the distribution of pictures of guns. The consequence is that its regulation is wildly underinclusive when judged against its asserted justification, which in our view is alone enough to defeat it. Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint. See City of Ladue v. Gilleo, 512 U. S. 43, 51 (1994); Florida Star v. B. J. F., 491 U. S. 524, 540 (1989). Here, California has singled out the purveyors of video games for disfavored treatment — at least when compared to booksellers, cartoonists, and movie producers — and has given no persuasive reason why.
The Act is also seriously underinclusive in another respect — and a respect that renders irrelevant the contentions of the concurrence and the dissents that video games are qualitatively different from other portrayals of violence. The California Legislature is perfectly willing to leave this dangerous, mind-altering material in the hands of children so long as one parent (or even an aunt or uncle) says it’s OK. And there are not even any requirements as to how this parental or avuncular relationship is to be verified; apparently the child’s or putative parent’s, aunt’s, or uncle’s say-so suffices. That is not how one addresses a serious social problem.
California claims that the Act is justified in aid of parental authority: By requiring that the purchase of violent video games can be made only by adults, the Act ensures that parents can decide what games are appropriate. At the outset, we note our doubts that punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority. Accepting that position would largely vitiate the rule that “only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].” Erznoznik, 422 U. S., at 212-213.
*803 But leaving that aside, California cannot show that the Act’s restrictions meet a substantial need of parents who wish to restrict their children’s access to violent video games biit cannot do so. The video-game industry has in place a voluntary rating system designed to inform consumers about the content of games. The system, implemented by the Entertainment Software Rating Board (ESRB), assigns age-specific ratings to each video game submitted: EC (Early Childhood); E (Everyone); E10+ (Everyone 10 and older); T (Teens); M (17 and older); and AO (Adults Only — 18 and older). App. 86. The Video Software Dealers Association encourages retailers to prominently display information about the ESRB system in their stores; to refrain from renting or selling adults-only games to minors; and to rent or sell “M” rated games to minors only with parental consent. Id., at 47. In 2009, the Federal Trade Commission (FTC) found that, as a result of this system, “the video game industry outpaces the movie and music industries” in “(1) restricting target-marketing of mature-rated products to children; (2) clearly and prominently disclosing rating information; and (3) restricting children’s access to mature-rated products at retail.” FTC, Report to Congress, Marketing Violent Entertainment to Children 30 (Dec. 2009), online at http:// www.ftc.gov/os/2009/12/P994511violententertainment.pdf (as visited June 24, 2011, and available in Clerk of Court’s case file) (FTC Report). This system does much to ensure that minors cannot purchase seriously violent games on their own, and that parents who care about the matter can readily evaluate the games their children bring home. Filling the remaining modest gap in concerned parents’ control can hardly be a compelling state interest.[9]
*804 And finally, the Act’s purported aid to parental authority is vastly overinclusive. Not all of the children who are forbidden to purchase violent video games on their own have parents who care whether they purchase violent video games. While some of the legislation’s effect may indeed be in support of what some parents of the restricted children actually want, its entire effect is only in support of what the State thinks parents ought to want. This is not the narrow tailoring to “assisting parents” that restriction of First Amendment rights requires.
* * *
California’s effort to regulate violent video games is the latest episode in a long series of failed attempts to censor violent entertainment for minors. While we have pointed out above that some of the evidence brought forward to support the harmfulness of video games is unpersuasive, we do not mean to demean or disparage the concerns that underlie the attempt to regulate them — concerns that may and doubtless do prompt a good deal of parental oversight. We have no business passing judgment on the view of the California Legislature that violent video games (or, for that matter, any other forms of speech) corrupt the young or harm their moral development. Our task is only to say whether or not such works constitute a “well-defined and narrowly limited clas[s] of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem,” Chaplinsky, 315 U. S., at 571-572 (the answer plainly is no); and if not, whether the regulation of such works is justified by that high degree of necessity we have described as a compelling state interest (it is not). Even where the protection *805 of children is the object, the constitutional limits on governmental action apply.
California’s legislation straddles the fence between (1) . addressing a serious social problem and (2) helping concerned parents control their children. Both ends are legitimate, but when they affect First Amendment rights they must be pursued by means that are neither seriously under-inclusive nor seriously overinclusive. See Church of Lukumi Babalu Aye, Inc. v. Hialeah, 508 U. S. 520, 546 (1993). As a means of protecting children from portrayals of violence, the legislation is seriously underinclusive, not only because it excludes portrayals other than video games, but also because it permits a parental or avuncular veto. And as a means of assisting concerned parents it is seriously overinclusive because it abridges the First Amendment rights of young people whose parents (and aunts and uncles) think violent video games are a harmless pastime. And the overbreadth in achieving one goal is not cured by the underbreadth in achieving the other. Legislation such as this, which is neither fish nor fowl, cannot survive strict scrutiny.
We affirm the judgment below.

It is so ordered.

 Justice Alito distinguishes Stevens on several grounds that seem to us ill founded. He suggests, post, at 814 (opinion concurring in judgment), that Stevens did not apply strict scrutiny. If that is so (and we doubt it), it would make this an a fortiori case. He says, post, at 814, that the California Act punishes the sale or rental rather than the “creation” or “possession” of violent depictions. That distinction appears nowhere in Stevens itself, and for good reason: It would make permissible the prohibition of printing or selling books — though not the writing of them. "Whether government regulation applies to creating, distributing, or consuming speech makes no difference. And finally, Justice Alito points out, post, at 814, that Stevens “left open the possibility that a more narrowly drawn statute” would be constitutional. True, but entirely irrelevant. Stevens said, 559 U. S., at 482, that the “crush-video” statute at issue there might pass muster if it were limited to videos of acts of animal cruelty that violated the law where the acts were performed. There is no contention that any of the virtual characters depicted in the imaginative videos at issue here are criminally liable.

 The statute in Ginsberg restricted-the sale of certain depictions of ‘“nudity, sexual conduct, sexual excitement, or sado-masochistic abuse’” that were ‘“[h]armful to minors.’” A depiction was harmful to minors if it:
*794 “(i) predominantly appeals to the prurient, shameful or morbid interest of minors, and
“(ü) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and
“(iii) is utterly without redeeming social importance for minors.” 390 U. S., at 646 (Appendix A to opinion of the Court) (quoting N. Y. Penal Law § 484-h(1)(f)).

 Justice Thomas ignores the holding of Erznoznik, and denies that persons under 18 have any constitutional right to Gpoalc or bo spoken to without their parents’ consent. He cites no case, state or federal, supporting this view, and to our knowledge there is none. Most of his dissent is devoted to the proposition that parents have traditionally had the power to control what their children hear and say. This is true enough. And it perhaps follows from this that the state has the power to enforce parental prohibitions — to require, for example, that the promoters of a rock eoncort exclude those minors whose parents have advised the promoters that their children are forbidden to attend. But it does not follow that the state has the power to prevent children from hearing or saying anything without their parents’ prior consent. The latter would mean, for example, that it could be made criminal to admit persons under 18 to a political rally without their parents’ prior written consent — even a political rally in support of laws against corporal punishment of children, or laws in favor of greater rights for minors. And what is good for First Amendment rights of speech must be good for First Amendment rights of religion as well: It could be made criminal to admit a person under 18 to church, or to give a person under 18 a religious tract, without his parents’ prior consent. Our point is not, as Justice Thomas believes, post, at 836, n. 2, merely that such laws are “undesirable.” They are obviously an infringement upon the religious freedom of young people and thooo who wish to proselytizo young people. Such laws do not enforce parental authority over children’s speech and religion; they impose governmental authority, subject only to a parental veto. In the absence of any precedent for state control, uninvited by the parents, over a child’s speech and religion (Justice Thomas cites none), and in the absence of any justification for such control that would satisfy strict scrutiny, those laws must be unconstitutional. This argument is not, as Justice Thomas asserts, “circular,” ibid. It is the absence of any historical warrant or compelling justification for such restrictions, not our ipse dixit, that renders them invalid.

 Justice Auto accuses us of pronouncing that playing violent video games “is not different in ‘kind’ ” from reading violent literature. Post, at 806. Well of course it is different in kind, but not in a way that causes the provision and viewing of violent video games, unlike the provision and reading of books, not to be expressive activity and hence not to enjoy First Amendment protection. Reading Dante is unquestionably more cultured and intellectually edifying than playing Mortal Kombat. But these cultural and intellectual differences are not constitutional ones. Crudely violont video games, tawdry TV shows, and cheap novels and magazines are no less forms of speech than The Divine Comedy, and restrictions upon them must survive strict scrutiny — a question to which we devote our attention in Part III, infra. Even if we can see in them “nothing of any possible value to society .. ., they are as much entitled to the protection *797 of free speech as the best of literature.” Winters v. New York, 338 U. S. 507, 510 (1948).

 The crusade against comic books was led by a psychiatrist, Frederic Wertham, who told the Senate Judiciary Committee that “as long as the crime comic books industry exists in its present forms there are no secure homes.” Juvenile Delinquency (Comic Books): Hearings before the Subcommittee to Investigate Juvenile Delinquency, 83d Cong., 2d Sess., 84 (1954). Wertham’s objections extended even to Superman comics, which he described as “particularly injurious to the ethical development of chil *798 dren.” Id., at 86. Wertham’s crusade did convince the New York Legislature to pass a ban on the sale of certain comic books to minors, but it was vetoed by Governor Thomas Dewey on the ground that it was unconstitutional given our opinion in Winters, supra. See People v. Bookcase, Inc., 14 N. Y. 2d 409, 412-413, 201 N. E. 2d 14, 15-16 (1964).

 See Video Software Dealers Assn. v. Schwarzenegger, 556 F. 3d 950, 963-964 (CA9 2009); Interactive Digital Software Assn. v. St. Louis County, 329 F. 3d 954 (CA8 2003); American Amusement Machine Assn. v. Kendrick, 244 F. 3d 572, 578-579 (CA7 2001); Entertainment Software Assn. v. Foti, 451 F. Supp. 2d 823, 832-833 (MD La, 2006); Entertainment Software Assn. v. Hatch, 443 F. Supp. 2d 1065, 1070 (Minn. 2006), aff’d, 519 F. 3d 768 (CA8 2008); Entertainment Software Assn. v. Granholm, 426 F. Supp. 2d 646, 653 (ED Mich. 2006); Entertainment Software Assn. v. Blagojevich, 404 F. Supp. 2d 1051, 1063 (ND Ill. 2005), aff’d, 469 F. 3d 641 (CA7 2006).

 One study, for example, found that children who had just finished playing violent video games were more likely to fill in the blank letter in “explo_e” with a “d” (so that it reads “explode”) than with an “r” (“explore”). App. 496, 506 (internal quotation marks omitted). The prevention of this phenomenon, which might have been anticipated with common sense, is not a compelling state interest.

 Justice Auto is mistaken in thinking that we fail to take account of “new and rapidly evolving technology,” post, at 806. The studies in question pertain to that new and rapidly evolving technology, and fail to show, with the degree of certitude that strict scrutiny requires, that this subject-matter restriction on speech is justified. Nor is Justice Alito correct in attributing to us the view that “violent video games really present no serious problem.” Ibid. Perhaps they do present a problem, and perhaps none of us would allow our own children to play them. But there are all sorts of “problems” — some of them surely more serious than this one — that cannot be addressed by governmental restriction of free expression: for example, the problem of encouraging anti-Semitism (National Socialist Party of America v. Skokie, 432 U. S. 43 (1977) (per curiam)), the problem of spreading a political philosophy hostile to the Constitution (Noto v. United States, 367 U. S. 290 (1961)), or the problem of encouraging disrespect for the Nation’s flag (Texas v. Johnson, 491 U. S. 397 (1989)).
Justice Breyer would hold that California has satisfied strict scrutiny based upon his own research into the issue of the harmfulness of violent video games. See post, at 858-872 (appendixes to dissenting opinion) (listing competing academic articles discussing the harmfulness vel non of violent video games). The vast preponderance of this research is outside the record — and in any event we do not see how it could lead to Justice Breyer’s conclusion, since he admits he cannot say whether the studies on his side are right or wrong. Post, at 853. Similarly, Justice Axito says he is not “sure” whether there are any constitutionally dispositive differences between video games and other media. Post, at 806. If that is so, then strict scrutiny plainly has not been satisfied.

 Justice Breyer concludes that the remaining gap is compelling because, according to the FTC’s report, some “20% of those under 17 are still able to buy M-rated video games.” Post, at 856 (citing FTC Report 28). But some gap in compliance is unavoidable. The sale of alcohol to minors, for example, has long been illegal, but a 2005 study suggests that *804 about 18% of retailers still sell alcohol to those under the drinking age. Brief for State of Rhode Island et al. as Amici Curiae 18. Even if the sale of violent video games to minors could be deterred further by increasing regulation, the government does not have a compelling interest in each marginal percentage point by which its goals are advanced.