# STATE OF MINNESOTA
# IN COURT OF APPEALS
# A15-1826

State of Minnesota,
Respondent,

vs.

Final Exit Network, Inc.,
Appellant.

**Filed December 19, 2016**
**Affirmed**
**Smith, Tracy M., Judge**

Dakota County District Court
File No. 19HA CR-12-1718

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Phillip D. Prokopowicz, Chief Deputy County Attorney, Elizabeth M. Swank, Assistant County Attorney, Hastings, Minnesota (for respondent)

Robert Rivas (pro hac vice), Tallahassee, Florida; and Paul Engh, Minneapolis, Minnesota (for appellant)

Randall D. Tigue, Randall Tigue Law Office, P.A., Golden Valley, Minnesota (for amicus curiae Atheists for Human Rights)

Edward Rudofsky (pro hac vice), Zane and Rudofsky, New York, New York; and Sam Glover, Minneapolis, Minnesota (for amicus curiae First Amendment Lawyers Association)

Patrick C. Elliott, Madison, Wisconsin (for amicus curiae Freedom from Religion Foundation)

        Considered and decided by Smith, Tracy M., Presiding Judge; Larkin, Judge; and

Rodenberg, Judge.

## S Y L L A B U S

The district court's jury instructions on assisting another in taking the other's life were not unconstitutionally overbroad under the First Amendment because the instructions followed the language of the Minnesota Supreme Court's decision in *State v. Melchert-Dinkel*, 844 N.W.2d 13 (Minn. 2014).

## O P I N I O N

**SMITH, TRACY M.**, Judge

Appellant Final Exit Network, Inc. (Final Exit) appeals its conviction of assisting in a suicide. Final Exit argues that Minn. Stat. § 609.215, subd. 1 (2014), which makes it a crime for a person to intentionally assist another in taking the other's life, is facially unconstitutional under the First Amendment. Final Exit also asserts an as-applied challenge to the jury instructions and to the application of the statute to the facts of this case. Because we conclude that the Minnesota Supreme Court's decision in *Melchert-Dinkel*, 844 N.W.2d at 13, bars Final Exit's facial and as-applied challenges, we affirm.

## FACTS

Final Exit is a nonprofit company incorporated in the state of Georgia that advocates for the right to die. An individual may become a member of Final Exit by paying an annual fee of $50. Final Exit provides its members experiencing debilitating mental or physical illness with counseling services and information on end-of-life care, including methods to hasten death by suicide.

When a member makes the decision to end his or her life, the member contacts Final Exit requesting "exit services" and provides Final Exit with a personal statement and

2

medical diagnosis.[1]  In order to receive exit services, a member must demonstrate that the member has "an incurable condition which causes intolerable suffering" and is mentally competent, physically strong enough to perform the required tasks, and able to procure the necessary equipment.

A Final Exit case coordinator contacts the member seeking exit services and conducts a telephone interview to assess whether the member is mentally sound and an appropriate candidate for exit services.  The case coordinator then refers the case to a first responder, who conducts a lengthier interview.  The first responder informs the member that the member must read the book *Final Exit* (3d ed.) with an addendum or watch a video called *Final Exit*.  These materials instruct the member on death by helium asphyxiation. Once the member has read the book or watched the video, the first responder may provide the member with the names and addresses of manufacturers who sell the hood used to commit suicide by way of helium asphyxiation.  The first responder also collects information about the member's living situation and the family's knowledge of the member's plan to commit suicide to assess whether "the applicant's environment is secure enough for [Final Exit] to work in."  Final Exit's medical director then reviews the member's information and assesses whether the member has a "horrible disease" and has done everything possible "to make life bearable."  The medical director makes the final decision on whether Final Exit will provide a member with exit services.

---

[1] Final Exit uses the words "exit" or "self-deliverance" instead of "suicide" to distinguish between the "self-caused death of someone who is 'suicidal' and that of someone who is not 'suicidal,' and thus does not want to die, but who has made a rational choice to discontinue intolerable and irremediable suffering."

After a member is approved for exit services, Final Exit assigns an "exit guide" to prepare the member for his or her suicide. At least one month before the suicide, the guide informs the member where to purchase the necessary equipment. The guide does not physically assist the member in acquiring the equipment. The guide visits the member in person and rehearses the procedure with the member before the planned day of the suicide. During the rehearsal, the member assembles the equipment and the guide answers any questions the member may have about whether the hood is properly connected to the tanks. On the day of the suicide, two guides are usually present and discreetly arrive and leave the member's residence to avoid being seen. The guides do not physically assist the member in conducting the procedure. The guides watch the member put on the hood and perform the procedure. After the procedure, a guide checks the member's pulse to determine that the member has died and then disposes of the equipment.

At issue in this case is Final Exit's role in the suicide of D.D. D.D. suffered from chronic pain from 1996 until her death in May 2007. D.D. applied for membership and requested exit services from Final Exit in January 2007. A first responder interviewed D.D. in early February and provided her with information about reading *Final Exit* and "general information" about Final Exit's "preferred inhalation method." On February 6, Final Exit's medical director approved D.D. for exit services. D.D. did not inform her family of her plans to commit suicide. One week before D.D. committed suicide in May, D.D.'s guide traveled to Minneapolis and drove to D.D.'s home.[2] On the day of the suicide,

---

[2] D.D.'s guide had died by the time of trial, and there was therefore no direct testimony regarding what occurred at the meeting. There was, however, testimony and evidence

4

Final Exit's medical director and D.D.'s guide flew to Minneapolis-St. Paul Airport and drove to D.D.'s home. The necessary equipment for helium asphyxiation was in her living room when they arrived. Neither the medical director nor the guide touched the equipment. As testified to by the medical director,[3] if D.D. had not connected the helium tanks and hood properly, they would have advised her on how to correct the mistake. When she was ready, D.D. placed the hood on her head and turned the valves to the helium tank. D.D. died at approximately 12:30 p.m. The medical director checked D.D.'s pulse after the procedure to ensure that she had died. The medical director and guide removed the hood from D.D., left D.D.'s home, and disposed of the equipment in a dumpster. D.D. had requested that the exit guides dispose of the equipment to avoid the stigma of suicide.

D.D.'s husband discovered D.D. at approximately 6:30 p.m. that evening and called emergency services. A police officer arrived and observed that D.D. was propped up on the couch, tucked beneath a blanket, and had her hands "crossed and peaceful looking" on her chest. Following an autopsy, the medical examiner concluded that D.D. had died of atherosclerotic-coronary-artery disease, a hardening of the arteries. No criminal investigation of D.D.'s death took place at that time.

As part of an unrelated matter, the Georgia Bureau of Investigations (GBI) conducted an investigation into Final Exit's business activities and seized materials related to D.D.'s death. GBI provided evidence about Final Exit's role in D.D.'s suicide to the

regarding Final Exit's general policies and practices to rehearse the helium-asphyxiation procedure with the member at this meeting.

[3] The medical director was given use immunity at trial.

Minnesota Bureau of Criminal Apprehension, which opened an investigation in the beginning of 2010. In May 2012, a grand jury indicted Final Exit for "intentionally advis[ing], encourag[ing], or assist[ing] another in taking the other's own life." Minn. Stat. § 609.215, subd. 1.

The district court concluded in a pretrial order that the "advises" prohibition in the statute is unconstitutionally overbroad under the First Amendment, but the "encourages" prohibition survives strict scrutiny. The state filed a pretrial appeal. In an unpublished opinion released in September 2013, this court held that both the "advises" and "encourages" prohibitions are unconstitutional under the First Amendment. *State v. Final Exit Network, Inc.*, No. A13-0563, 2013 WL 5418170 at *7 (Minn. App. Sept. 30, 2013), *stay vacated* (Minn. June 17, 2014). The Minnesota Supreme Court granted review of this court's decision but stayed the proceedings pending its decision in *Melchert-Dinkel*.

In *Melchert-Dinkel*, the Minnesota Supreme Court addressed the constitutionality of Minn. Stat. § 609.215, subd. 1. In its decision, the court severed the "advises" and "encourages" provisions from the statute. 844 N.W.2d at 23-24. The court concluded that the statute's "advises" and "encourages" prohibitions are facially unconstitutional under the First Amendment because they broadly restrict general discussions about suicide. *Id.* at 23-24. The court, however, upheld the statute's "assists" prohibition as constitutional. *Id.* The court interpreted "assists" to "proscribe[] speech or conduct that provides another person with what is needed for the person to commit suicide." *Id.* at 23. It also determined that "assists" is sufficiently narrow because speech or conduct enabling another to commit suicide "must be targeted at a specific individual." *Id.* The court held that "speech

6

instructing another on suicide methods falls within the ambit of constitutional limitations on speech that assists another in committing suicide." *Id.* After deciding *Melchert-Dinkel*, the Minnesota Supreme Court denied further review of *State v. Final Exit Network, Inc.*

Before trial, both Final Exit and the state submitted proposed jury instructions. Final Exit proposed jury instructions defining "assists" as

> to provide tangible physical assistance in the suicide. One does not "assist" in a suicide by merely being present, or by advising on the subject, encouraging the suicide, or providing information or knowledge. One does not "assist" in a suicide by merely instructing another on suicide methods. Similarly, one does not "assist" in a suicide by expressing a viewpoint on whether the suicide is morally justifiable under the circumstances or by providing emotional support to another who is committing suicide. One must affirmatively "assist" in a suicide to be guilty of the crime.

The district court issued an order on jury instructions in February 2015 defining "assists" as follows:

> To "assist" means that [Defendant] enabled [D.D.] through either physical conduct or words that were specifically directed at [D.D.] and that the conduct or words enabled [D.D.] to take her own life. One has not "assisted" where one has only expressed a moral viewpoint on suicide or provided mere comfort or support.

Final Exit moved for a rehearing on the jury instructions on the meaning of "assists," arguing that the jury instructions were overbroad under the First Amendment. The district court denied this motion.

Trial lasted for six days in May 2015. A jury found Final Exit guilty of assisting another in taking the other's own life.

Final Exit appeals.

7

**ISSUES**

I.       Is Minn. Stat. § 609.215, subd. 1, facially unconstitutional under the First Amendment?

II.      Is Minn. Stat. § 609.215, subd. 1, unconstitutional under the First Amendment as applied to the facts of Final Exit's case?

**ANALYSIS**

Final Exit raises both facial and as-applied First Amendment freedom-of-speech challenges to Minn. Stat. § 609.215, subd. 1, (the statute) on appeal. We review the constitutionality of a statute de novo. *Melchert-Dinkel*, 844 N.W.2d at 18. The statute criminalizes "intentionally . . . assist[ing] another in taking the other's own life." Minn. Stat. § 609.215, subd. 1. In *Melchert-Dinkel*, the Minnesota Supreme Court interpreted the term "assists" as "proscrib[ing] speech or conduct that provides another person with what is needed for the person to commit suicide" or "enabl[ing] the person to commit suicide." *Melchert-Dinkel*, 844 N.W.2d at 23. Speech enabling a suicide must "be targeted at a specific individual." *Id.* "[M]erely expressing a moral viewpoint or providing general comfort or support" does not rise to the level of "assisting." *Id.*

The First Amendment of the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I, and applies to the states through the Fourteenth Amendment. *Gitlow v. New York*, 268 U.S. 652, 666, 45 S. Ct. 625, 630 (1925). When a statute "explicitly regulates expression based on content," it is "presumptively invalid, and the Government bears the burden to rebut that presumption." *United States v. Stevens*, 559 U.S. 460, 468, 130 S. Ct. 1577, 1584 (2010) (quotation omitted). Criminal statutes allowing for prosecution of an individual based entirely on

8

what the individual has said are generally content-based restrictions. *Melchert-Dinkel*, 844 N.W.2d at 19. Absent an exception from First Amendment protection, a content-based restriction is invalid unless it survives strict scrutiny, meaning (1) "it is justified by a compelling government interest," (2) it "is narrowly drawn to serve that interest," and (3) there is "a direct causal link between the restriction imposed and the injury to be prevented." *United States v. Alvarez*, 132 S. Ct. 2537, 2549 (2012); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799, 131 S. Ct. 2729, 2738 (2011). A compelling government interest "must be pursued by means that are neither seriously underinclusive nor seriously overinclusive." *Brown*, 564 U.S. at 805, 131 S. Ct. at 2741-42. The government must use the "least restrictive means" to further a compelling interest. *Sable Commc'ns of Cal., Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115, 126, 109 S. Ct. 2829, 2836 (1989).

An individual may bring both facial and as-applied challenges against government action, but the same substantive First Amendment standard applies to each type of challenge. *Rew v. Bergstrom*, 845 N.W.2d 764, 778 (Minn. 2014).

I. **According to *Melchert-Dinkel*, Minn. Stat. § 609.215, subd. 1, is not facially unconstitutional under the First Amendment.**

Final Exit first argues that the "assists" provision in the statute is facially unconstitutional. We are bound by Minnesota Supreme Court precedent. *State v. Grisby*, 806 N.W.2d 101, 114 (Minn. App. 2011), *aff'd* 818 N.W.2d 511 (Minn. 2012) (affirming this court's use of Minnesota Supreme Court precedent).

The Minnesota Supreme Court concluded in *Melchert-Dinkel* that the statute's "assists" prohibition is a content-based restriction and survives strict scrutiny under the

9

First Amendment. 844 N.W.2d at 21-23. The court concluded that the government has a compelling interest in preserving human life and preventing suicide. *Id.* at 22 (citing *Washington v. Glucksberg*, 521 U.S. 702, 728-34, 117 S. Ct. 2258, 2271-75 (1997)). The court further concluded that the statute is narrowly tailored to effectuate this compelling interest. By its reference to assisting "another," the statute only reaches "targeted speech aimed at a specific individual." *Id.* at 22. In addition, "assists" further narrows the statute's reach by criminalizing only speech that "enabl[es] the person to commit suicide" or "instruct[s] another on suicide methods." *Id.* at 23. For these reasons, the Minnesota Supreme Court concluded that the statutory prohibition on "only speech that assists suicide, combined with the statutory limitation that such enablement must be targeted at a specific individual," renders the statute narrowly tailored and linked to the state's compelling interest in the preservation of life. *Id.* The statute's "assists" provision thus survives strict scrutiny and Final Exit's facial challenge to the statute. *Id.*

## II. Minn. Stat. § 609.215, subd. 1, is not unconstitutional as applied to the facts of Final Exit's case.

Final Exit also raises as-applied challenges to the statute. In its brief and at oral arguments, Final Exit failed to distinguish between its as-applied and facial challenges. Rather, Final Exit suggested that these challenges overlap. While facial and as-applied challenges use the same substantive First Amendment law, the challenges depend on different legal analyses. An as-applied challenge uses the same substantive First Amendment standards as a facial challenge, *Rew*, 845 N.W.2d at 778, but involves "a judgment as to the constitutionality of a statute based on the harm to the litigating party."

10

*State v. Mireles*, 619 N.W.2d 558, 561 n.1 (Minn. App. 2000). We examine the constitutionality of the statute, limited to the "context of the specific circumstances" presented in the case. *Rew*, 845 N.W.2d at 780.

### A. The jury instructions are not unconstitutionally overbroad.

Final Exit argues that the jury instructions are unconstitutionally overbroad under the First Amendment. Final Exit does not argue that the jury instructions are erroneous and we do not consider any arguments to that effect. Rather, Final Exit argues that the jury instructions applied an unconstitutionally overbroad interpretation of *Melchert-Dinkel*.

The overbreadth doctrine provides an alternative to strict scrutiny in the First Amendment context. *Stevens*, 559 U.S. at 473, 130 S. Ct. at 1587. A restriction on speech is unconstitutionally overbroad under the First Amendment if it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118-19, 123 S. Ct. 2191, 2196 (2003) (quotations omitted). An overbroad statute is invalid until it is narrowed to remove "the seeming threat or deterrence to constitutionally protected expression." *Id.* at 119, 123 S. Ct. at 2196. The overbreadth doctrine protects against "chilling" of free expression when a statute would otherwise prompt individuals to "abstain from protected speech." *Id.*

Final Exit's overbreadth argument seeks to revive its facial challenge to the statute. In support of its overbreadth claim, Final Exit cites the U.S. Supreme Court's decision in *Virginia v. Black*, 538 U.S. 343, 364, 123 S. Ct. 1536, 1550 (2003). In *Black*, the Court concluded that the plain language of a Virginia statute did not violate the First Amendment, but the jury instructions, which had not been disavowed by the Virginia Supreme Court,

11

rendered the statute facially unconstitutional. *Id.* The jury instructions in *Black* broadened Virginia's cross-burning statute to reach political speech with no intent to intimidate and thus conflicted with Supreme Court precedent. *Id.* *Black* is distinguishable from this case, because the district court's jury instructions comport with the Minnesota Supreme Court's decision in *Melchert-Dinkel* and do not expand the statute's reach beyond its plainly legitimate sweep.

The district court's jury instructions in this case follow the language of the *Melchert-Dinkel* decision. The jury instructions require the jury to find "either physical conduct or words that were specifically directed at [D.D.] and that the conduct or words enabled [D.D.] to take her own life." *Melchert-Dinkel* construes "assists" to include speech or physical conduct that "involves enabling the person to commit suicide" and is "targeted at a specific individual." 844 N.W.2d at 23. The jury instructions also clarify that "[o]ne has not 'assisted' where one has only expressed a moral viewpoint on suicide or provided mere comfort or support," a proposition that finds support in *Melchert-Dinkel*. *Id.* ("['Assists'] signifies a level of involvement in the suicide beyond merely expressing a moral viewpoint or providing general comfort or support."). If the jury instructions in this case are overbroad, so too is the Minnesota Supreme Court's interpretation of the statute in *Melchert-Dinkel*. We will not question Minnesota Supreme Court precedent. *Grisby*, 804 N.W.2d at 114.

Additionally, Final Exit's proposed jury instructions would misinterpret the statute in light of *Melchert-Dinkel*. Final Exit's proposed jury instructions define "assists" to mean "to provide tangible physical assistance in the suicide." This definition ignores the

12

Minnesota Supreme Court's conclusion that "speech alone may also enable a person to commit suicide." *Melchert-Dinkel*, 844 N.W.2d at 23. Moreover, Final Exit's proposed instructions state that "[o]ne does not 'assist' in a suicide by merely instructing another on suicide methods." This statement directly contradicts *Melchert-Dinkel*. The Minnesota Supreme Court explicitly defined "assists" to include "speech instructing another on suicide methods." *Id.* Even if the district court's jury instructions had erroneously applied *Melchert-Dinkel*, Final Exit's proposed instructions would not be among the acceptable alternatives because they misstate the law. *See State v. Koppi*, 798 N.W.2d 358, 362 (Minn. 2011) ("A jury instruction is erroneous if it materially misstates the applicable law.").

We are bound by the Minnesota Supreme Court's decision in *Melchert-Dinkel*. *See Grisby*, 804 N.W.2d at 114. We therefore reject Final Exit's overbreadth challenge to the district court's jury instructions because the jury instructions use the same language as *Melchert-Dinkel*, 844 N.W.2d at 23.

**B. Minn. Stat. § 609.215, subd. 1, is not unconstitutional under the First Amendment as applied to the facts of Final Exit's case.**

Final Exit argues that the statute cannot survive strict scrutiny as applied to the facts of this case. To evaluate this as-applied challenge, we again examine whether the statute furthers a compelling state interest. *Rew*, 845 N.W.2d at 780. We also ask whether the prohibition on "assisting" in a suicide burdens Final Exit's speech no more than necessary and is therefore narrowly tailored. *Id.* Final Exit argues (1) the statute is not supported by

13

a compelling state interest in this case and (2) the statute is not narrowly tailored because it is underinclusive as applied to this case. We reject both of Final Exit's arguments.

### 1. Minn. Stat. § 609.215, subd. 1, furthers the state's compelling interest in the preservation of human life in this case.

Final Exit and amicus curiae, Atheists for Human Rights, contend that the government has no compelling interest in mandating "suffering by the mentally competent terminally ill whose condition causes them to suffer intolerably."[4] In *Melchert-Dinkel*, the Minnesota Supreme Court concluded that the state has a compelling interest in the preservation of human life. 844 N.W.2d at 22.

Final Exit again seeks to challenge the Minnesota Supreme Court's holding in *Melchert-Dinkel*. None of the facts in this case alters the state's compelling interest as found by the Minnesota Supreme Court in *Melchert-Dinkel*. The state has a compelling interest in the preservation of D.D.'s life and the prevention of her suicide, regardless of her incurable condition. The fact that Final Exit provides its services only to members with incurable conditions does not negate the state's compelling interest. *Id.*

---

[4] Atheists for Human Rights also argues that the state's interest must be "entirely secular in nature." They derive this principle from the U.S. Supreme Court's decision in *Edwards v. Aguillard*, which considered a statute's constitutionality under the Establishment Clause. 482 U.S. 578, 586-87, 107 S. Ct. 2573, 2579 (1987). *Aguillard* contained no analysis of First Amendment freedom-of-speech protections. Because it was raised by amicus, and not Final Exit, the argument that the statute in this case is not secular in nature, in violation of the Establishment Clause, is not properly before this court. *League of Women Voters Minn. v. Ritchie*, 819 N.W.2d 636, 645 n.7 (Minn. 2012) ("Generally, we do not decide issues raised by an amicus that are not raised by the litigants themselves.").

**2. Minn. Stat. § 609.215, subd. 1, is narrowly tailored to advance the state's interest in the preservation of human life in this case.**

Even if the statute advances a compelling state interest, Final Exit contends that the statute is not narrowly tailored as applied to this case. In particular, Final Exit argues that the statute is underinclusive as applied.

> A narrowly tailored regulation is one that actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least restrictive alternative).

*Republican Party of Minn. v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (describing narrow tailoring while analyzing a First Amendment challenge to a Minnesota canon of judicial conduct). The underinclusiveness doctrine protects against government acts that may be designed to "give one side of a debatable public question an advantage in expressing its views to the people." *City of Ladue v. Gilleo*, 512 U.S. 43, 51, 114 S. Ct. 2038, 2043 (1994) (quotation omitted) (holding that a statute banning residential signs, except those that fell within one of ten exceptions, was facially unconstitutional because it was underinclusive). The government's exemption of some speech "from an otherwise legitimate regulation of a medium of speech . . . may diminish the credibility of the government's rationale for restricting speech in the first place." *Id.* at 52, 114 S. Ct. at 2044.

Final Exit cites the U.S. Supreme Court's decision in *Brown v. Entm't Merchs. Ass'n* as an example of application of the underinclusiveness doctrine. 564 U.S. at 786, 131 S.

Ct. at 2729. In *Brown*, the Court invalidated a California statute prohibiting the sale of violent video games to minors as facially unconstitutional under the First Amendment because the statute was underinclusive. *Id.* at 789, 802, 131 S. Ct. at 2732-33, 2740. The Court assumed that California had an interest in shielding children from violent media. *Id.* at 800-01, 131 S. Ct. at 2739-40. But, given this governmental interest, the Court concluded that the restriction of the sale of video games to minors was "wildly underinclusive." *Id.* at 802, 131 S. Ct. at 2740. The statute did not prevent minors from consuming other violent media, such as books, cartoons, or movies. *Id.* The statute restricted minors' access to some violent media, but in doing so "singled out the purveyors of video games for disfavored treatment." *Id.* The Court therefore invalidated the statute as facially unconstitutional because it was underinclusive. *Id.*

Final Exit argues that the statute is underinclusive because the statute does not equally prohibit speech that provides information about suicide methods. According to Final Exit, the information it provides is unprotected simply because it is provided to a particular individual, *see Melchert-Dinkel*, 844 N.W.2d at 23 ("[S]peech instructing another on suicide methods falls within the ambit of constitutional limitations on speech."), but a book or Internet article providing the same information—instructions on suicide methods—is protected speech under *Melchert-Dinkel* because the speech is not targeted at a particular individual. *Id.* at 24. Final Exit analogizes the facts of its case to *Brown* because dissemination of information on suicide methods through other means of communication, such as books or articles on the Internet, remains protected, while dissemination of information to specific individuals is unprotected.

16

Final Exit's underinclusiveness argument is, in essence, an attempt to invalidate a central holding of *Melchert-Dinkel*. The Minnesota Supreme Court in *Melchert-Dinkel* concluded that the statute's "assists" provision is narrowly tailored precisely because it reaches "targeted speech aimed at a specific individual." *Id.* at 22. The court expressly distinguished this type of speech from speech that advises or encourages suicide but is not targeted at a specific individual. *Id.* Unlike in *Brown*, where the statute regulated some violent speech, while failing to regulate other equally violent types of speech, and thus was underinclusive, the statute here does not fail to regulate speech that is equivalent to the proscribed targeted speech. The court in *Melchert-Dinkel* found the statute narrowly tailored, and we are bound by that decision. *See Grisby*, 804 N.W.2d at 114.

As applied to Final Exit in this case, we conclude that the statute burdened no more speech than necessary to further the state's compelling interest in preserving D.D.'s life. *Rew*, 845 N.W.2d at 784. Final Exit informed D.D. which book to read and about Final Exit's "preferred inhalation method." On the day of her death, Final Exit's representatives observed D.D. connect the tubing to the helium tanks and would have explained how to hook it up properly had she not done so. The medical director checked D.D.'s pulse to ensure that she had died. Consistent with their plan with D.D., Final Exit representatives removed the equipment from D.D.'s home and disposed of it in a dumpster to create the appearance of natural death. In the "context of the specific circumstances" presented in this case, *see id.* at 780, the statute was applied to restrict Final Exit's speech instructing D.D. on suicide methods. No less restrictive alternative would have served the state's interest in protecting D.D.'s life. *Sable Commc'ns*, 492 U.S. at 126, 109 S. Ct. at 2836.

17

The statute does not prohibit Final Exit's policy advocacy for the right to die or the emotional support it provides its members by listening to their stories. *Melchert-Dinkel*, 844 N.W.2d at 23-24. But Final Exit was not convicted for speech "tangential to the act of suicide." *See id.* Final Exit was convicted for "instructing another on suicide methods." *See id.* at 23. The statute therefore did not prevent Final Exit "from expressing [its] ideas and messages in a number of other forums and ways." *See Rew*, 845 N.W.2d at 781.

The statute in this case is narrowly tailored to serve the government's compelling interest in the preservation of human life. We therefore conclude that the statute survives strict scrutiny and is constitutionally permissible as applied to this case.[5] *Melchert-Dinkel*, 844 N.W.2d at 23-24.

## D E C I S I O N

Because the Minnesota Supreme Court held in *Melchert-Dinkel* that the "assists" provision of Minn. Stat. § 609.215, subd.1, is facially constitutional under the First Amendment, and because the statute is constitutional as applied to this case, we conclude that Final Exit's conviction for intentionally assisting another in taking the other's own life did not violate the First Amendment.

**Affirmed.**

---

[5] An amicus curiae brief submitted by the First Amendment Lawyers Association argues that the statute was unconstitutionally vague at the time Final Exit allegedly assisted in D.D.'s suicide. Neither party briefed this argument. We do not consider it. *League of Women Voters Minn.*, 819 N.W.2d at 645 n.7 ("Generally, we do not decide issues raised by an amicus that are not raised by the litigants themselves.").