LOHIER, Circuit Judge, concurring
I fully agree with the majority opinion. I write separately to add only that in the specific circumstances of this case we might also rely on the public function test to conclude that MNN and its employees are state actors subject to First Amendment restrictions when they regulate the public's use of the public access channels at issue here. "Under the public function test, state action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity." Grogan v. Blooming Grove Volunteer Ambulance Corps, 768 F.3d 259, 264-65 (2d Cir. 2014) (quotation marks omitted). A private entity's regulation of speech in a public forum is a public function when the State has expressly delegated the regulatory function to that entity. See, e.g., Lee v. Katz, 276 F.3d 550, 555-56 (9th Cir. 2002).
*309 The dissent recognizes this established doctrine, Partial Dissent at 310-11, but maintains that MNN's public access channels are not public forums because they are merely "entertainment facilit[ies]" that, as such, do not involve a function "traditionally exclusively reserved to the State," id. at 311 (quoting Halleck v. City of New York, 224 F.Supp.3d 238, 246 (S.D.N.Y. 2016) ). Other courts have this view. See, e.g., Wilcher v. City of Akron, 498 F.3d 516, 519 (6th Cir. 2007) ("TV service is not a traditional service of local government.").
But the distinction between entertainment and public speech is perilous as a matter of constitutional law and in this case unfounded as a matter of fact.
"The Free Speech Clause exists principally to protect discourse on public matters, but ... it is difficult to distinguish politics from entertainment, and dangerous to try." Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 790, 131 S.Ct. 2729, 180 L.Ed.2d 708 (2011) (Scalia, J.). "What is one man's amusement, teaches another's doctrine." Id. (quoting Winters v. New York, 333 US 507, 510, 68 S.Ct. 665, 92 L.Ed. 840 (1948) ). Depending on one's point of view, political debates as far back as Lincoln and Douglas, rock concerts in Central Park, see Ward v. Rock Against Racism, 491 U.S. 781, 790-91, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), and the comedian's late night television routine, see FCC v. Pacifica Found., 438 U.S. 726, 744-47, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), might count as entertainment, or politics, or something in between. So simply dismissing a public access channel as an "entertainment facility" fails to remove it from the category of a public forum.
One look at MNN's website reveals that MNN's public access channels largely offer "the video equivalent of the speaker's soap box or the electronic parallel to the printed leaflet." Denver Area Educ. Telecomms. Consortium, Inc. v. FCC, 518 U.S. 727, 791, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (Kennedy, J., concurring in part, concurring in the judgment in part, and dissenting in part) (quotation marks omitted). The programming relates to political advocacy, cultural and community affairs, New York elections, religion-in a word, democracy. See www.mnn.org/schedule (last visited February 1, 2018); Majority Op. at 307; 23-34 94th St. Grocery Corp. v. New York City Bd. of Health, 685 F.3d 174, 183 n.7 (2d Cir. 2012) (taking judicial notice of a website).
As the majority suggests without saying it outright, New York City delegated to MNN the traditionally public function of administering and regulating speech in the public forum of Manhattan's public access channels. For this reason, on this record, I agree that MNN and its employees are subject to First Amendment restrictions.