*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A25-1245**

Joe Leko,
Respondent,

vs.

Laurence Edward Henderson,
Appellant.

**Filed April 6, 2026
Affirmed
Schmidt, Judge
Johnson, Judge, dissenting.**

Dakota County District Court
File No. 19HA-CV-24-4280

Kathryn M. Keena, Dakota County Attorney, William M. Topka, Assistant County Attorney, Hastings, Minnesota (for respondent)

Blair W. Nelson, Blair W. Nelson, LTD., Bemidji, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Larson, Judge; and Schmidt, Judge.

**NONPRECEDENTIAL OPINION**

**SCHMIDT**, Judge

Respondent Joe Leko, in his official capacity as Dakota County Sheriff, petitioned the district court to revoke appellant Laurence Edward Henderson's permit to carry a pistol. The district court granted the sheriff's petition and revoked Henderson's permit. On appeal, Henderson argues that the revocation of his permit to carry a pistol under Minnesota

Statutes section 624.714 (2024) violated his Second Amendment rights. Henderson also argues that the district court erred when it concluded that the sheriff established by clear and convincing evidence that there was a substantial likelihood that Henderson was a danger to himself or the public. We affirm.

## FACTS

Before turning to the facts of this case, we provide a brief background on permits to carry firearms and petitions to revoke such permits under Minnesota law.

Minnesota prohibits "[a] person, other than a peace officer," from carrying, holding, or possessing "a pistol . . . in a public place . . . without first having obtained a permit to carry the pistol." Minn. Stat. § 624.714, subd. 1a. A permit applicant must meet several criteria and submit the application to their county sheriff who is responsible for issuing permits. *Id.*, subd. 2.

A county sheriff may petition the district court to revoke an individual's permit. *Id.*, subd. 8(c). The district court must then hold a hearing, at which the sheriff must establish by clear and convincing evidence "that there exists a substantial likelihood that the applicant is a danger to self or the public if authorized to carry a pistol under a permit." *Id.*, subd. 12(a), (b)(2). If the district court determines that the sheriff satisfied their burden, the court must revoke the permit. *See id.*, subd. 8(c).

We now turn to the district court's findings of fact that support its order revoking Henderson's permit to carry a firearm.

2

### The July 2021 Convenience Store Incident & Renewal of Henderson's Permit

In 2021, Henderson got into a verbal altercation with T.H. in the parking lot of a convenience store. T.H. called out and began to approach Henderson while waving his arms. When T.H. was between 12 and 15 feet away, Henderson put his hand on his concealed, holstered gun and warned T.H., at least twice, that Henderson would shoot if T.H. did not stop his approach. After Henderson determined that T.H. posed no threat of physical harm, the two continued to verbally argue. Law enforcement responded, investigated, and filed a report. No charges were filed.

Henderson applied to renew his permit to carry in 2023. As part of the renewal process, Henderson completed a required safety training course, which covered civilian use of force, conflict avoidance, and the duty to retreat, among other topics. The sheriff renewed Henderson's permit.

### The July 2024 Bowling Alley Altercation

In 2024, Henderson went bowling with friends, consumed alcohol, and had his gun stored in his backpack inside the bowling alley. While Henderson was bowling, he was confronted by a woman whom he previously dated. The woman's boyfriend approached Henderson and joined in the verbal altercation. The boyfriend's friend, who showed signs of intoxication, also joined the verbal altercation and threatened to "F [Henderson] up" and told Henderson to "come outside" and "handle this." The woman, her boyfriend, and the boyfriend's friend then left the bowling alley.

Henderson went to his backpack, removed his gun, loaded it, and holstered the pistol on his hip. As Henderson was leaving the bowling alley he told an employee to call 911.

3

He then exited through the same door that the other group had used to leave the bowling alley. Once outside, Henderson checked his car and observed no damage. He then noticed the woman, her boyfriend, and the boyfriend's friend about 30 to 40 feet away. The boyfriend's friend approached Henderson and Henderson drew his pistol, held it to his side, and told the man to stop. After Henderson saw that the man did not have a weapon, Henderson re-holstered his pistol. A physical altercation ensued, during which Henderson did not pull out, point, or discharge his firearm.

Law enforcement responded, investigated, and filed a report. The state charged Henderson with a crime but later dropped the charges.

### *The Sheriff's Petition to Revoke Henderson's Permit*

The sheriff petitioned to revoke Henderson's permit because "there exist[ed] a substantial likelihood that [Henderson] [was] a danger to the public if authorized to carry a pistol under a permit." The sheriff cited the 2021 and 2024 altercations and contended that Henderson had "a history of engaging in violent confrontations and brandishing his pistol(s) during those confrontations either in an attempt to intimidate or to use it."

### *The District Court Held an Evidentiary Hearing and Revoked the Permit*

The district court held an evidentiary hearing on the sheriff's petition. Five witnesses testified, including Henderson. The district court also received four exhibits into evidence: Henderson's 2023 application to renew his permit to carry; a subpoena issued to The Modern Sportsman; curriculum used in The Modern Sportsman's firearm safety training classes; and a deposition of an eyewitness to the 2024-bowling-alley altercation.

4

The district court granted the sheriff's petition and revoked Henderson's permit to carry a firearm in public. The district court first noted that the statute prohibited it from considering "[i]ncidents of alleged criminal misconduct that [were] not investigated and documented." *Id.*, subd. 12(b)(2). The district court next noted that its analysis was not restricted solely to incidents that resulted in criminal convictions or circumstances in which Henderson drew, pointed, or discharged his gun. The district court rejected Henderson's self-defense assertions, determining that his "underlying conduct show[ed] a tendency to overreact and escalate and demonstrate[d] . . . poor judgment that endangers others." The district court determined that the sheriff demonstrated by clear and convincing evidence a substantial likelihood that Henderson would be a danger to himself or the public if he remained authorized to carry a pistol.

Henderson appeals.

## DECISION

Henderson raises two arguments, contending that the district court (1) abused its discretion in determining that the sheriff established a substantial likelihood that Henderson was a danger to himself or others; and (2) violated his Second Amendment rights by revoking his permit. We address the clear-and-convincing-evidence argument first because we would not need to reach the constitutional question if we were to agree with Henderson on his clear-and-convincing-evidence argument. *See In re Senty-Haugen*, 583 N.W.2d 266, 269 n.3 (Minn. 1998) ("It is well-settled law that courts should not reach constitutional issues if matters can be resolved otherwise.").

5

**I.      The district court did not abuse its discretion by revoking Henderson's permit.**

Henderson argues that the sheriff failed to establish by clear and convincing evidence a substantial likelihood that Henderson was a danger to himself or to the public if authorized to carry a pistol. Henderson's argument on this issue is limited to the district court's findings of fact and application of those findings to the statutory standard.

"When reviewing mixed questions of law and fact, we will correct erroneous applications of law, but accord the [district] court discretion in its ultimate conclusions and review such conclusions under an abuse of discretion standard." *Langford Tool & Drill Co. v. Phenix Biocomposites, LLC*, 668 N.W.2d 438, 442 (Minn. App. 2003) (quotation omitted). A district court's factual findings are reviewed for clear error, which exists only if the finding is "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021) (quotation omitted).

**A.      The district court did not commit an error of law.**

Henderson argues that the district court "erred as a matter of law" when it concluded that there existed a substantial likelihood that he was a danger to himself or to the public if authorized to carry a pistol. Henderson contends that the substantial-likelihood-of-danger standard requires a gun to be misused, illegally used, pointed, or discharged.

In support of his argument, Henderson cites three nonprecedential decisions from this court that he contends demonstrate that any decision to revoke a permit to carry a firearm must be based upon violent, threatening, or felonious conduct. But the reasoning in each of these cases contradicts Henderson's argument. *See Nikiforakis v. Stanek*,

No. A09-0407, 2009 WL 2928772, at *2-3 (Minn. App. Sept. 15, 2009) (noting that the substantial-likelihood-of-danger standard "does not require conviction of a crime; it only requires that the underlying conduct meets this standard"), *rev. denied* (Minn. Nov. 24, 2009); *J.M.P. v. Fletcher*, No. A04-921, 2005 WL 221890, at *8 (Minn. App. Feb. 1, 2005) (reasoning that the underlying conduct at issue demonstrated that "appellant ha[d] a tendency toward impulsive, over-reactionary, and aggressively threatening behavior[,] . . . [which was a] tendency [that] made it more likely that appellant would use a firearm in an impulsive manner"), *rev. denied* (Minn. Apr. 19, 2005); *Belcher v. Fletcher*, No. A07-1015, 2008 WL 1972737, at *5 (Minn. App. May 6, 2008) (affirming revocation of permit, in part, based upon appellant having showed "poor judgment on numerous occasions"). Henderson cites no case that affirmatively requires evidence of violent, threatening, or felonious conduct. Although such evidence may be relevant to a district court's consideration in deciding whether to revoke a permit, a district court is not limited to the conduct that Henderson identifies. The statutory language also does not limit a district court's decision to be based only upon certain conduct, so we decline to impose such a requirement.[1]

Henderson failed to demonstrate that the district court erred as a matter of law.

---

[1] The only limitation the statute places on a district court's discretion in considering underlying conduct when denying or granting a petition to revoke a permit is that the district court may not consider "[i]ncidents of alleged criminal misconduct that [were] not investigated [or] documented." Minn. Stat. § 624.714, subd. 12(b)(2).

7

**B.    The district court did not make a clearly erroneous finding of fact.**

Henderson argues that the district court clearly erred because the sheriff did not establish by clear and convincing evidence that Henderson was an "enhanced danger to the public." But Henderson fails to identify any specific factual finding as being clearly erroneous. This, alone, is reason to reject his argument. *See In re Civ. Commitment of Kropp*, 895 N.W.2d 647, 653 (Minn. App. 2017) ("Minnesota appellate courts decline to reach an issue in the absence of adequate briefing."), *rev. denied* (Minn. June 20, 2017).

Henderson generally insists that his conduct in both instances amounted to nothing more than a Minnesotan's legally recognized "right to use reasonable force to protect their person or property." But whether the use of any force is "reasonable" is a determination that is properly made by the finder of fact. *State v. Glowacki*, 630 N.W.2d 392, 403 (Minn. 2001) ("Generally, a reasonableness determination is properly made by the finder of fact"). Here, the district court expressly rejected Henderson's arguments that his conduct amounted to nothing more than self-defense. Instead, the district court agreed with the sheriff's characterization of the underlying conduct. In doing so, the district court found that Henderson's version of events was not credible because it did "not account for all the evidence presented." We must defer to a district court's credibility findings because, as was the case here, "[t]he district court [was] in the best position to evaluate witness credibility." *Griffin v. State*, 941 N.W.2d 404, 408 (Minn. 2020).

In analyzing both incidents, the district court found that Henderson exhibited "poor judgment," demonstrated a "disposition to escalate situations that could be easily neutralized," and showed a "tendency to escalate rather than avoid or mitigate

8

confrontations." The district court further found that Henderson's conduct ran "completely contrary to the safety training that" Henderson admittedly received, and violated "his duty to retreat and avoid the danger." If Henderson was truly concerned for his "physical safety or the safety of his property," the district court noted that Henderson had options available such as "asking for assistance from the security [at the bowling alley] or from the police." The district court found that Henderson also "could have used a different exit to monitor his property from a distance." These findings are supported by the record and, thus, are not clearly erroneous. *Kenney*, 963 N.W.2d at 221.

Henderson takes issue with the district court's characterization of, and inferences drawn from, the evidence. Our clear-error standard of review does not empower us to disturb such findings. As the Minnesota Supreme Court instructed,

> [T]he role of an appellate court is not to weigh, reweigh, or inherently reweigh the evidence when applying a clear-error review; that task is best suited to, and therefore is reserved for, the factfinder. Instead, it is the duty of an appellate court to fully and fairly consider [the] evidence, but so far only as is necessary to determine beyond question that it reasonably tends to support the findings of the factfinder. When the record reasonably supports the findings at issue on appeal, it is immaterial that the record might also provide a reasonable basis for inferences and findings to the contrary.

*Id.* at 223 (quotations and citations omitted). We reject Henderson's invitation to reweigh the evidence in his favor. We discern no clear error in the district court's findings of fact.

With no error in its determination of the law and no clear error in its findings of fact, we discern no abuse of discretion in the district court's ruling that Henderson posed a substantial likelihood of danger to himself or others.

9

**II.    The district court did not violate Henderson's constitutional rights by revoking his permit to carry.**

Having rejected Henderson's non-constitutional argument, we must now turn to his contention that the district court violated his rights under the Second Amendment to the United States Constitution. We review a constitutional challenge to a statute de novo. *State v. Jones*, 25 N.W.3d 732, 735 (Minn. App. 2025).

**A.    Henderson raises an as-applied challenge to the statute.**

We must first determine the appropriate analysis, which depends on whether Henderson raises an as-applied or a facial challenge to the constitutionality of the statute. The differences to each analysis are "significant." *State v. Gaal*, 21 N.W.3d 256, 263 (Minn. App. 2025). Henderson insists that he is raising an as-applied challenge, which would limit our analysis to the "specific circumstances presented in the case." *State v. Final Exit Networks, Inc.*, 889 N.W.2d 296, 304 (Minn. App. 2016) (quotation omitted). The sheriff contends that Henderson is asserting a facial challenge, which would require Henderson to "establish that no set of circumstances exists under which the [statute] would be valid." *Gaal*, 21 N.W.3d at 264 (quotation omitted). We agree with Henderson.

Henderson's opening brief on appeal concedes that a facial challenge to the law would fail and, instead, presents this issue as an as-applied challenge. Henderson's reply brief expressly argues that he is waging only an as-applied challenge. Because the relief that would follow our decision would not reach beyond the particular circumstances of this case, we use the as-applied standard to Henderson's Second Amendment challenge. *Final Exit Networks*, 889 N.W.2d at 304.

10

**B.     The statute, as applied to Henderson, is constitutional.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.[2]  The constitutional right to bear arms "[d]erive[s] from English practice" and "is among the fundamental rights necessary to our system of ordered liberty." *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (quotation omitted).  But that right has limits.  *Id.*  It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 691 (quotation omitted).

The United States Supreme Court has articulated a two-step analysis for determining whether a statute regulating firearms violates the Second Amendment.  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022).  *See also United States v. Harrison*, 153 F.4th 998, 1009-32 (10th Cir. 2025) (applying *Bruen*'s two-step analysis to an as-applied challenge).  Step one requires us to determine whether "the Second Amendment's plain text covers," and thus "presumptively protects," "an individual's conduct." *Bruen*, 597 U.S. at 17.  If the conduct is presumptively protected, step two requires us to determine whether the regulating statute "is consistent with this [n]ation's historical tradition of firearm regulation." *Id.*  To be constitutional, the statute must be "relevantly similar to laws that our tradition is understood to permit, apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Rahimi*, 602 U.S. at 692 (alteration in original) (quotations omitted).

---

[2] The Minnesota Constitution contains no express right to keep and bear arms.

11

### 1. The Second Amendment presumptively protects the right to carry a pistol outside of the home.

The Supreme Court has concluded that the Second Amendment protects the conduct at issue. *Bruen*, 597 U.S. at 33 ("The Second Amendment's plain text . . . presumptively guarantees [law-abiding citizens] a right to 'bear' arms in public for self-defense."). Thus, step one of the *Bruen* analysis is met.

### 2. As applied to Henderson, the statute is consistent with the nation's historical tradition of regulating firearms.

Henderson relies on *Rahimi* to support his argument that the statute is unconstitutional as applied to him. In *Rahimi*, the Supreme Court upheld a federal statute that prohibited individuals subject to a domestic-violence restraining order from possessing firearms. 602 U.S. at 699-700. The statute required an order prohibiting the possession of a gun to include a finding that the individual posed "a credible threat to the physical safety of [an] intimate partner, or a child of the partner or individual." *Id.* at 685 (alteration in original) (quotation omitted). The Supreme Court concluded that the statute was sufficiently analogous to our nation's regulatory tradition of prohibiting "individuals who threaten physical harm to others from misusing firearms." *Id.* at 690. The Court rejected the government's alternative argument that an individual may be prohibited from possessing a firearm on the basis that they are not "responsible." *Id.* at 701-02.

Henderson argues that we must reverse the district court's order revoking his permit because his underlying conduct (1) did not pose a credible threat to the physical safety of others and (2) merely amounted to irresponsibility, which *Rahimi* held is not a valid basis to restrict Second Amendment rights. We disagree on both counts.

12

First, the Supreme Court in *Rahimi* did not adopt a standard that a district court must find a "credible threat" of physical harm to others before a citizen's Second Amendment rights may be restricted. Instead, the Court addressed the specific statute at issue in that particular case, which imposed the requirement of a "credible threat" finding. *Id.* at 685. Other courts have also rejected the same "credible threat" argument that Henderson raises. *See, e.g.*, *Antonyuk v. James*, 120 F.4th 941, 966 (2d Cir. 2024). Henderson offers no analysis as to why Minnesota's statutorily imposed required finding—"that there exists a substantial likelihood that the applicant is a danger to self or the public if authorized to carry a pistol under a permit" (Minn. Stat § 624.714, subd. 12(b)(2))—runs afoul of *Rahimi*. Thus, we reject Henderson's invitation to engage in a "credible threat" analysis.

Second, the statute is consistent with our nation's historical regulations disarming certain individuals of their firearms. In *Rahimi*, the Supreme Court recounted centuries of English and American gun laws containing "provisions barring people from misusing weapons to harm or menace others." 602 U.S. at 693-98. For example, "as early as the 1200s and 1300s," the Parliament of England began to pass laws regulating arms.[3] *Id.* at 694. In 1662, Parliament passed a law "authoriz[ing] the King's agents to seize all

---

[3] The 1328 Statute of Northampton provided, with exceptions, that

> Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere[.]"

*Bruen*, 597 U.S. at 40.

Armes in the custody or possession of any person . . . judge[d] dangerous to the Peace of the Kingdome." *Id.* at 694 (second alteration in original) (quotation omitted).

In the 1700s and early 1800s, two distinct types of firearm-violence-prevention regulations emerged. *Id.* at 694-95. The first type was surety laws, which "authorized magistrates to require individuals suspected of future misbehavior to post a bond." *Id.* at 695. Some of these surety laws focused on firearms. *Id.* at 696 (noting a 1795 Massachusetts surety law that "authoriz[ed] justices of the peace to arrest all who [went] armed offensively [and] require[d] of the offender to find sureties for his keeping the peace" (third alteration in original) (quotations omitted)). The second type, "going[-]armed" laws, "provided a mechanism for punishing those who had menaced others with firearms." *Id.* at 697 (quotation omitted). These laws "prohibited riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land" because it "disrupted the public order and le[d] almost necessarily to actual violence." *Id.* (alterations in original) (quotations omitted). The historical surety and going-armed laws evidence a tradition of disarming individuals who would pose "a clear threat of physical violence to another" if they possessed a firearm. *Id.* at 698.

Minnesota's law, as applied to Henderson, is consistent with, and "relevantly similar" to, at least two historical traditions of regulating firearms. *Bruen*, 597 U.S. at 17, 29. First, Minnesota's law is akin to a king's agents seizing arms from people who were judged to be "dangerous to the Peace of the Kingdome." *Rahimi*, 602 U.S. at 694. Second, Minnesota's statute is relevantly similar with laws enacted in the 1700 and 1800s, which prohibited "going armed, with dangerous . . . weapons, [to] terrify[] the good people of the

14

land." *Id.* at 697 (alterations in original) (quotations omitted). Like these historical traditions, Minnesota's process to disarm individuals includes an evidentiary hearing and ends with a district court determining whether the person is a danger to himself or others. Minn. Stat. § 624.714, subd. 12.[4] Thus, we conclude that Henderson's legal arguments for an as-applied challenge to the Minnesota statute are not persuasive.

Finally, Henderson argues that the facts presented by his case impermissibly burden his constitutional right to bear arms. But Henderson does little more than quibble with the district court's findings of fact, inferences drawn from those facts, and implicit credibility determinations. We rejected those arguments above. The district court appropriately analyzed Henderson's underlying conduct and—consistent with the Second Amendment—disarmed Henderson after finding that there is a substantial likelihood that Henderson is a danger to himself or to the public. *Id.*

**Affirmed.**

---

[4] Any difference in the historical regulations and Minnesota's "modern" regulation is not relevant to our holding. *See Bruen*, 597 U.S. at 30 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." (emphasis in original)).

**JOHNSON**, Judge (dissenting)

In Minnesota, a county sheriff may deny an application for a permit to carry a pistol in a public place if the applicant is prohibited from possessing a firearm by certain Minnesota laws or "any federal law." Minn. Stat. § 624.714, subd. 2(b) (2024). A person is prohibited from possessing a firearm in Minnesota if, for example, the person has committed a crime of violence or has been civilly committed after a judicial determination of mental illness. *Id.*, subd. 2(b)(4)(v); Minn. Stat. § 624.713, subd. 1(2)-(3) (2024). Also, a county sheriff may deny an application for a pistol permit if "there exists a substantial likelihood that the applicant is a danger to self or the public if authorized to carry a pistol under a permit." Minn. Stat. § 624.714, subds. 2(b), 6(a)(3). In addition, a sheriff may seek to revoke an existing pistol permit by petitioning a district court and proving the existence of a substantial likelihood of danger by clear and convincing evidence. *Id.*, subds. 6(a)(3), 8(c), 12(b).

In this case, Henderson has not been convicted of a crime of violence, has not been civilly committed based on mental illness, and is not disqualified from possessing a firearm by any Minnesota law or federal law. Instead, the district court concluded that there exists a substantial likelihood of danger to Henderson or the public if he were allowed to retain his pistol permit. The district court based that conclusion on two incidents in which Henderson was threatened by others. In both of those incidents, it is undisputed that Henderson did not fire his pistol, did not point it at anyone, and did not otherwise mishandle it.

Henderson makes two arguments for reversal. First, he argues that, as a matter of federal constitutional law, the district court's revocation of his pistol permit violates his Second Amendment right to bear arms. Second, he argues that, as a matter of state statutory law, the evidence and findings do not support the district court's conclusion that a substantial likelihood of danger to himself or the public would exist if he were allowed to retain his permit.

Given the evidence presented at the evidentiary hearing, the district court erred by concluding that there exists a substantial likelihood of danger to Henderson or the public if he were allowed to retain his permit. In addition, the district court's application of the substantial-likelihood-of-danger provisions of section 624.714 violates Henderson's rights under the Second Amendment. Therefore, I respectfully dissent from the opinion of the court.

## I.

It is appropriate to first consider Henderson's argument challenging the district court's conclusion that a substantial likelihood of danger would exist if he were allowed to retain his permit.

It is important at the outset to identify the applicable standards of review. I agree with the court that we must apply a clear-error standard of review to the district court's findings of historical fact. *See In re Civil Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021). But we must apply a *de novo* standard of review to the district court's conclusions of law, including the substantial-likelihood-of-danger determination. *See Lo v. Commissioner of Revenue*, 892 N.W.2d 817, 820 (Minn. 2017); *Wilson v. Mortgage*

*Resource Ctr., Inc.*, 888 N.W.2d 452, 460 (Minn. 2016); *see also State v. Jones*, 848 N.W.2d 528, 533 (Minn. 2014) (reviewing "findings of historical fact under the clearly erroneous standard" but "district court's application of the law to those facts de novo").

At the evidentiary hearing, Sheriff Leko called three witnesses other than Henderson. The sheriff's first witness was a captain with responsibility for gun permits. His testimony was short, consisting of little more than his opinion that Henderson "has a tendency to use his firearm in a threatening manner . . . towards people." The captain did not identify the information or sources on which his opinion is based. For each incident, the sheriff introduced the testimony of one person with first-hand knowledge. With respect to the first incident, the sheriff called T.H., who described the disagreement that preceded the meeting at the convenience store, stated that he "approached [Henderson] across the parking lot with [his] arms in the air, waiving," and admitted that Henderson "was scared" of him. With respect to the second incident, the sheriff introduced the deposition testimony of a bowling-alley employee, who witnessed some of the interactions between Henderson and the three persons who confronted him. She testified that the initial confrontation had "fully deescalated" but that, while Henderson was paying for his bowling at the checkout desk, "the other party . . . antagonized him," using belligerent and profane language. When a drunken man approached Henderson in the parking lot, the employee saw Henderson remove his pistol from its holster, point it downward at a 45-degree angle, and re-holster it a few seconds later.

The district court's two-page order is accompanied by a twelve-page memorandum. The first three pages of the memorandum consist of findings of historical fact, which hew

closely to the evidence. I do not construe Henderson's appellate brief to challenge those findings. The remainder of the district court's memorandum, which is captioned "conclusions of law," consists of the district court's application of the law to the facts. That part of the district court's decision is the focus of Henderson's state-law challenge.

Henderson first argues that the statutory requirement of a "substantial likelihood of danger . . . contemplates unlawful use of a firearm" such that, as a corollary, the requisite level of danger "can only logically apply to unlawful use of a firearm." This argument has no support in the statute's text, which does not expressly require that a substantial likelihood of danger arise from an unlawful act. *See* Minn. Stat. § 624.714, subds. 6(a)(3), 8(c), 12(b). This court previously has stated in a nonprecedential opinion that the statute "does not require conviction of a crime" but, rather, "only requires that the underlying conduct meets" the statutory standard. *Nikiforakis v. Stanek*, No. A09-0407, 2009 WL 2928772, at *2 (Minn. App. Sept. 15, 2009), *rev. denied* (Minn. Nov. 24, 2009). In this case, the court properly rejects Henderson's argument that the substantial likelihood of danger required by section 624.714 must be based on unlawful conduct. *See supra* at 6-7.

Henderson also argues that the district court "erred as a matter of law" in reaching its substantial-likelihood-of-danger conclusion because he "never misused a firearm," "warned the aggressors . . . orally . . . rather than threatening the aggressors by pointing a gun at them," "responsibly put away his firearm" in the second incident after realizing that the approaching man was unarmed, and "did not discharge his weapon in either situation."

This part of Henderson's argument has merit. The evidence and findings do not show that he inappropriately used his pistol. Rather, the evidence and findings compel the

conclusion that Henderson safely carried a pistol and defended himself against two aggressors by informing them of the pistol's presence so as to deter them from attacking him, not by pointing the pistol at them or actually firing it. With respect to the first incident, the district court found that, when T.H. approached him, Henderson made him aware of his pistol without removing it from its holster. With respect to the second incident, the district court found that Henderson withdrew his pistol from its holster when another man, who was drunk and had explicitly threatened Henderson earlier that evening, approached him in a physically aggressive manner. The district court further found that Henderson pointed his pistol downward, not at the other man, and re-holstered it after perceiving that the man was unarmed. The district court's findings regarding Henderson's conduct in the second incident are consistent with testimony of the sheriff's-office captain, who agreed on cross-examination that it may be reasonable for an armed person to withdraw a firearm if another person is approaching quickly and to re-holster the firearm when the threat has dissipated. In both incidents, Henderson did not fire his pistol, did not point it at anyone, and did not otherwise mishandle it. The evidence and findings indicate that, if Henderson was allowed to retain his pistol permit, he would respond to any future threats in a similarly responsible manner.

The district court reasoned, in part, that Henderson "shows a tendency to overreact and escalate" and uses "poor judgment." The district court explained that, in the first incident, Henderson "followed [T.H.] inside a convenience store as the two continued to trade insults." That verbal exchange hardly supports the legal conclusion that there would be a substantial likelihood of danger if Henderson were allowed to retain his pistol permit.

The district court explained further that, in the second incident, Henderson "armed himself by removing his gun from his backpack, chambering a round, [and] holstering the firearm on his hip" before he went outside. In essence, the district court was concerned that Henderson was carrying a loaded pistol. But, as the sheriff's-office captain admitted on cross-examination, carrying a loaded pistol is expressly allowed by Henderson's pistol permit. *See* Minn. Stat. § 624.714, subd. 1a; *State v. Ndikum*, 815 N.W.2d 816, 821 (Minn. 2012). In addition, the district court's reasoning is inconsistent with Henderson's testimony that he went outside to check on his vehicle, which the district court acknowledged in its findings of fact. Henderson specifically denied that he "followed" the three antagonists to the parking lot, and the bowling-alley employee did not testify to the contrary. The district court did not determine that Henderson's testimony was not credible.[1]

Relatedly, the district court also reasoned that Henderson armed himself and went outside "while knowing that a physical altercation of some kind was highly likely." But there is no evidence or finding that Henderson believed that "a physical altercation . . . was highly likely." Henderson specifically testified that he did not "go outside [to] meet the other patrons" and hoped to not have a confrontation with them. Henderson also testified

---

[1]The opinion of the court suggests that the district court determined that Henderson was not a credible witness. *See supra* at 8. To the contrary, the district court did not make any determination about Henderson's credibility. In the conclusions-of-law section of its order, the district court stated that the *arguments* presented by *Henderson's attorney* "do not account for all the evidence presented by the petitioner." That statement does not refer to Henderson's testimony and, thus, does not constitute an implied finding that Henderson's testimony lacks credibility.

that he "went outside to check on [his] car" because he suspected that his former girlfriend might have intentionally damaged it. He also testified that he was concerned about the man who had said, "I'll 'F' you up," and was thinking about being prepared "if I had to defend myself." Henderson's decision to arm himself in light of a foreseeable risk does not tend to prove that he is dangerous when armed. Henderson testified further that, after walking out the door, he looked to his left, where he had parked his car, walked around it, saw that it was undamaged, and started to walk back toward the bowling alley. Only then did he see the other group, which was 30 to 40 feet away from him before one man began yelling at him and approaching him. Again, there was no contrary evidence, and the district court did not determine that Henderson was not credible.

The district court further reasoned that Henderson did not comply with a duty to retreat. The district court referred to a statute that authorizes a person to "use . . . reasonable force upon or toward the person of another without the other's consent" in certain circumstances. Minn. Stat. § 609.06, subd. 1 (2024). The district court also cited caselaw providing that, if a criminal defendant asserts the defense of self-defense in a criminal prosecution, the jury must consider whether the defendant had "a reasonable possibility of retreat to avoid the danger." *See State v. Baker*, 13 N.W.3d 401, 409 (Minn. 2024). But Henderson did not use his firearm in committing an assault, and this is not a criminal case. Section 609.06 and *Baker* have no application in a proceeding under section 624.714 to revoke a pistol permit. The district court's conclusion of law cannot be justified by its reasoning that Henderson breached a statutory duty to retreat because he had no such duty.

For these reasons, I would conclude that the district court erred in its legal conclusion that there would be a substantial likelihood of danger to Henderson or to the public if he were allowed to retain his pistol permit.

## II.

Henderson also argues that the district court's revocation of his pistol permit violates his Second Amendment right to bear arms.

I agree with the opinion of the court that Henderson's constitutional challenge to section 624.714 is an as-applied challenge. *See supra* at 10-11. In that respect, Henderson's argument is different from the arguments in the Second Amendment cases decided by the United States Supreme Court thus far in the 21st Century, all of which were facial challenges. *See District of Columbia v. Heller*, 554 U.S. 570, 573-76 (2008); *McDonald v. Chicago*, 561 U.S. 742, 749-53 (2010); *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 8-17 (2022); *United States v. Rahimi*, 602 U.S. 680, 689, 693, 700 (2024).[2]

On numerous occasions, however, the federal circuit courts have considered as-applied challenges to statutes regulating firearms. *See, e.g.*, *United States v. Connelly*, 117 F.4th 269, 272, 274-82 (5th Cir. 2024) (holding that 18 U.S.C. § 922(g)(3), which disarms

---

[2]The *Rahimi* Court held that 18 U.S.C. § 922(g)(8) is constitutional on its face and, in addition, stated that the statute is constitutional "as applied to the facts" of that case or "as applied to Rahimi." *Rahimi*, 602 U.S. at 690, 693, 700-01. I interpret the latter statements to illustrate that Rahimi had failed "to 'establish that no set of circumstances exists under which the Act would be valid'" and that the government had "demonstrate[d] that Section 922(g)(8) is constitutional in some of its applications." *Id.* at 693 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

unlawful user of, or person addicted to, any controlled substance, is unconstitutional as applied to "non-violent, marijuana smoking gunowner"); *see also United States v. Hemani*, No. 24-40137, 2025 WL 354982, at *1 (5th Cir. Jan. 31, 2025) (*per curiam*) (applying *Connelly*), *cert. granted*, 146 S. Ct. 326 (2025). Many such as-applied challenges resemble facial challenges because courts often consider whether a firearm regulation is unconstitutional whenever it is applied to a particular sub-category of a legislatively defined category of persons. For example, in *Zherka v. Bondi*, 140 F.4th 68 (2d Cir. 2025), the court analyzed an as-applied challenge to 18 U.S.C. § 922(g)(1), which disarms any person convicted of a crime punishable by more than one year of imprisonment, by asking "whether the government has justified Section 922(g)(1)'s application to Zherka by demonstrating that disarmament of nonviolent felons, *as a class or category of persons*, is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 77 (quotation omitted).

But some federal circuit courts have recognized that a more specific analysis is necessary if an as-applied challenge is based not on a legislatively defined category but, rather, on individual characteristics and circumstances. One federal circuit court has stated, "In determining whether *an individual* has met his burden to demonstrate that he is not dangerous, and thus falls outside of § 922(g)(1)'s constitutionally permissible scope, *courts . . . must focus on each individual's specific characteristics*." *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024) (emphasis added). Another federal circuit court, in considering an as-applied challenge brought by a person with a prior conviction of bookmaking, stated that a court cannot grant relief on such an as-applied challenge unless

the record is "sufficient for a court to make *an individualized determination* that the applicant does not presently pose the kind of danger envisioned by *Rahimi*." *Pitsilides v. Barr*, 128 F.4th 203, 210-11 (3d Cir. 2025) (emphasis added).

In this case, the revocation of Henderson's pistol permit is based solely on evidence and findings about his conduct on two specific occasions. Consistent with *Williams* and *Pitsilides*, Henderson is entitled to an individualized determination of the constitutionality of the revocation of his pistol permit. A *de novo* standard of review applies to the question whether a statute is constitutional as applied. *Rew v. Bergstrom*, 845 N.W.2d 764, 790 (Minn. 2014); *Schatz v. Interfaith Care Ctr.*, 811 N.W.2d 643, 653, 657 (Minn. 2012); *In re Individual 35W Bridge Lit.*, 806 N.W.2d 820, 829 (Minn. 2011).

**A.**

I agree with the opinion of the court that we must apply the two-part analytical framework prescribed by *Bruen*. *See supra* at 11-12. At the first step of the *Bruen* analysis, we must ask whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. The court reasons that the text of the Second Amendment applies to Henderson's interest in retaining his permit to carry a pistol in public. *See supra* at 12. Again, I agree. The *Bruen* Court asked "whether the plain text of the Second Amendment protects [the challengers'] proposed course of conduct—carrying handguns publicly for self-defense." *Bruen*, 597 U.S. at 32. The Court answered that question by stating, "We have little difficulty concluding that it does." *Id.* at 32.

**B.**

At the second step of the *Bruen* analysis, a court must consider whether the state can "justify its regulation" by "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17; *see also Rahimi*, 602 U.S. at 691. To do so, a court must use analogical reasoning to "ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Rahimi*, 602 U.S. at 692 (quotations omitted). "Why and how the regulation burdens the right are central to this inquiry." *Id.* A new law must be "analogous enough to pass constitutional muster" but it need not be a "dead ringer" or a "historical twin." *Bruen*, 597 U.S. at 30 (emphasis omitted). Because "'individual self-defense is "the *central component*" of the Second Amendment right . . . ,' whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry." *Id.* at 29 (quoting *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. at 599)).

The court reasons that section 624.714 "is consistent with the nation's historical tradition of regulating firearms." *See supra* at 12-15. I agree with that statement insofar as it means that the substantial-likelihood-of-danger provisions of section 624.714 are not facially unconstitutional. *See, e.g.*, *Rahimi*, 602 U.S. at 700 (concluding that 18 U.S.C. § 922(g)(8) is facially constitutional because "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety

D-11

of others"). But the facial validity of section 624.714 does not resolve Henderson's constitutional challenge. We must go further and determine whether *the application* of the statute to Henderson, resulting in *the elimination of his right* to carry a pistol in public, is constitutionally justified.

Thus, under the second part of *Bruen*, because this case is an *individualized* as-applied challenge, this court must ask whether the state can "justify" the revocation of Henderson's permit by "demonstrat[ing] that the [revocation] is consistent with this Nation's historical tradition of firearm regulation." *See Bruen*, 597 U.S. at 17; *see also Rahimi*, 602 U.S. at 691. The revocation must be "relevantly similar" to the restrictions authorized by "laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *See Rahimi*, 602 U.S. at 692 (quotations omitted). Furthermore, we must acknowledge that not every restriction imposed under a facially constitutional statute is consistent with the Second Amendment. "Even when a law regulates arms-bearing for a permissible reason, . . . it may not be compatible with the right *if it does so to an extent beyond what was done at the founding*." *Id.* (emphasis added).

Accordingly, this court's task is to determine whether the district court's revocation of Henderson's pistol permit restricts his Second Amendment rights in a manner and to an extent that the right to bear arms was restricted at the time of the founding. For two reasons, the district court's revocation of Henderson's pistol permit goes beyond what would have been done at that time.

## 1.

First, the district court's revocation of Henderson's pistol permit restricts his Second Amendment rights to an extent beyond what was done at the founding because the revocation is contrary to well-established caselaw stating that the Second Amendment protects the right to bear arms for purposes of personal protection.

The Supreme Court has stated that "individual self-defense is the *central component of the Second Amendment right*." *Bruen*, 597 U.S. at 29 (quotation omitted). When the Second Amendment was ratified, Americans understood it to protect the "'right of self-preservation' . . . permitting a citizen to 'repe[l] force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *Heller*, 554 U.S at 594-95 (quoting 1 St. George Tucker, *Blackstone's Commentaries* 145-46 n.42 (1803)). Consistent with this understanding, the Supreme Court has interpreted the Second Amendment to "'guarantee the individual right to possess and carry weapons *in case of confrontation*.'" *Bruen*, 597 U.S. at 32 (emphasis added) (quoting *Heller*, 554 U.S. at 592). Specifically, "the right to bear arms refers to the right to wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being *armed and ready for offensive or defensive action in a case of conflict with another person*." *Id.* (emphasis added) (quotations omitted).[3]

---

[3]At oral argument, Sheriff Leko's attorney stated that the revocation of Henderson's permit is ameliorated by the fact that, even without a permit, he may possess a firearm in his home, transport it for recreational purposes, and use it for hunting. That statement reflects an unduly narrow view of Second Amendment rights. In *Bruen*, the Court invalidated a local ordinance that forbade the possession of a firearm outside the home, reasoning that "confining the right to bear arms to the home would make little sense given

As explained above in part I of this dissenting opinion, Henderson used his pistol in a lawful manner to defend himself against two aggressors by informing them of the pistol's presence so as to deter them from attacking him, not by pointing the pistol at them or actually firing it. In the first incident, when T.H. approached him, Henderson made the man aware of his pistol, but the pistol always remained in its holster. In the second incident, Henderson withdrew his pistol from its holster as a precautionary measure as another man, who was drunk and had explicitly threatened Henderson earlier that evening, approached him in a physically aggressive manner. Henderson pointed his pistol downward, not at the other man, and re-holstered it after perceiving that the man was unarmed. Henderson's conduct in the second incident is consistent with testimony of the sheriff's-office captain, who agreed on cross-examination that it may be reasonable for an armed person to withdraw a firearm if another person is approaching quickly and to re-holster the firearm when the threat has dissipated. In both incidents, Henderson did not fire his pistol, did not point it at anyone, and did not otherwise mishandle it.[4]

---

that self-defense is the *central component* of the [Second Amendment] right itself." 597 U.S. at 32 (quotations omitted). The Court added, "After all, the Second Amendment guarantees an individual right to possess and carry weapons in case of confrontation," and "confrontation can surely take place outside the home. *Id.* at 33 (quotations omitted).

[4]In contrast, Rahimi became enraged during an argument with his girlfriend, dragged her to his car, retrieved a gun from under a car seat, and fired the gun as his girlfriend fled. *Rahimi*, 602 U.S. at 686. He later called his girlfriend and "warned that he would shoot her if she reported the incident." *Id.* Based on that evidence and evidence of additional incidents, a state trial court issued a temporary restraining order that prohibited Rahimi from contacting the woman for two years. *Id.* at 686-87. That temporary restraining order was the underlying basis of Rahimi's conviction of violating section 922(g)(8), but he also engaged in several other incidents of gun-related violence. *Id.* at 687-89.

Properly understood, Henderson's conduct is consistent with the core purpose of the Second Amendment: self-defense "in case of confrontation." *Bruen*, 597 U.S. at 33 (quotation omitted); *see also United States v. Cooper*, 127 F.4th 1092, 1098 (8th Cir. 2025) (rejecting government's argument that appellant was "too dangerous" because he possessed firearm "for *protection* after recent shooting at his residence" (quotation omitted)). Henderson's conduct during the two incidents is in harmony with traditional notions of the "right to wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being *armed and ready for offensive or defensive action in a case of conflict with another person.*" *See Bruen*, 597 U.S. at 32 (emphasis added) (quotation omitted).

Furthermore, the district court's decision conflicts with Second Amendment caselaw to the extent that the district court reasoned that Henderson uses "poor judgment." In *Rahimi*, the Court "reject[ed] the Government's contention that Rahimi may be disarmed simply because he is not 'responsible.'" 602 U.S. at 701. The Court stated that being "responsible" is not a prerequisite of the right to bear arms because the word is "vague" and "[i]t is unclear what such a rule would entail." *Id.* The Court noted that *Heller* and *Bruen* "did not define the term and said nothing about the status of citizens who were not 'responsible.'" *Id.* at 702. Because being "responsible" and having good "judgment" are similar in meaning and similarly vague and undefined, "good judgment" is not a prerequisite of the right to bear arms, and "poor judgment" cannot be a basis for restricting the right to bear arms. *See id.* at 701-02.

## 2.

Second, the district court's revocation of Henderson's pistol permit restricts his Second Amendment rights to an extent beyond what was done at the founding because the founding-era laws that justify section 624.714 as a general matter would not have resulted in a restriction similar to the revocation of Henderson's right to carry a pistol in public.

In determining whether a firearm regulation is facially constitutional, courts must consider whether the regulation is "consistent with the principles that underpin our regulatory tradition" and, in doing so, must use analogical reasoning to ascertain whether the regulation is "'relevantly similar' to laws that our tradition is understood to permit." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 29).

A similar analysis is required for an as-applied challenge. *See United States v. Cockerham*, 162 F.4th 500, 510 (5th Cir. 2025) (stating, in as-applied challenge to 18 U.S.C. § 922(g)(1) by person convicted of failing to pay child support, that "[h]istorical analysis determines whether a particular individual can be disarmed"); *Cooper*, 127 F.4th at 1094-96 (stating, in as-applied challenge to 18 U.S.C. § 922(g)(3) by person who smokes marijuana four times per week, that "relevant questions" were whether appellant "induce[d] terror" or "pose[d] a credible threat to the physical safety of others" (quotations omitted)). Accordingly, this court must consider whether the revocation of Henderson's pistol permit is "consistent with the principles that underpin our regulatory tradition" by using analogical reasoning to determine whether a person who engaged in conduct similar to Henderson's conduct would have been subject to a similar restriction under founding-era laws. *See Rahimi*, 602 U.S. at 691-92; *Bruen*, 597 U.S. at 28-29.

Sheriff Leko has the burden of "demonstrat[ing] that [revocation] is consistent with this Nation's historical tradition of firearm regulation." *See id.* at 17. On appeal, the sheriff points to two founding-era laws to justify the revocation, both of which were recognized by the *Bruen* Court and the *Rahimi* Court: surety laws and going-armed laws. *Rahimi*, 602 U.S. at 695-98; *Bruen*, 597 U.S. at 40-45, 55-60.

The first founding-era law on which Sheriff Leko relies—surety laws—are not relevantly similar to section 624.714. Founding-era surety laws were a form of "preventive justice" that authorized magistrates to require certain persons to post a bond. *Rahimi*, 602 U.S. at 694-97; *see also* 1 William Hawkins, *A Treatise of the Pleas of the Crown* 126-33 (1716); 4 William Blackstone, *Commentaries on the Laws of England* 251-53 (10th ed. 1787). If a person posted a bond and later broke the peace, the bond would be forfeited. *Rahimi*, 602 U.S. at 695; 4 Blackstone, *supra*, at 253. Importantly, surety laws "did not directly restrict public carry," *i.e.*, they did not result in the revocation of a person's right to bear arms; they merely "provide[d] financial incentives for responsible arms carrying." *Bruen*, 597 U.S. at 59. Founding-era surety laws were relevantly similar to the firearm regulation at issue in *Rahimi*, which temporarily disarmed a person subject to a domestic-violence restraining order based on a court's finding that the person was a credible threat toward another person. *See Rahimi*, 602 U.S. at 688 (citing 18 U.S.C. § 922(g)(8)). In this case, however, the district court *permanently* restricted Henderson's Second Amendment right to bear arms, without giving him an opportunity to retain his permit by posting a bond. Accordingly, historical surety laws do not justify the revocation of Henderson's pistol permit.

D-17

The second founding-era law on which Sheriff Leko relies—going-armed laws—also would not have allowed the revocation of the right to bear arms of a person who engaged in conduct similar to Henderson's conduct.  Going-armed laws were based on the ancient common-law prohibition of "affrays."  *Id.* at 697.  The word affray is "derived from the *French* (*Effraier*, to terrify) and commonly signifies a Skirmish or Fighting to the Terror of the People."  Theodore Barlow, *The Justice of Peace: A Treatise* 11 (1745); *see also* 1 Hawkins, *supra*, at 134; 4 Blackstone, *supra*, at 145.  As relevant here, an affray might occur in the founding era if "a Man arms himself with dangerous and unusual Weapons, in such a Manner as will naturally cause a Terror to the People."  1 Hawkins, *supra*, at 137; *see also* Barlow, *supra*, at 11-12.  This type of affray was addressed by going-armed laws, such as the 1328 Statute of Northampton, one of the earliest codifications of common-law going-armed affray, which served as a model for several founding-era going-armed laws.  Statute of Northampton, 2 Edw. 3 c. 3 (1328).[5]  A person found guilty of an affray could be punished by, among other measures, the "forfeiture of the arms."  4 Blackstone, *supra*, at 149.

However, the law of affray was limited such that it would not have applied to a person who engaged in conduct similar to Henderson's conduct.  First, an affray existed in the founding era only if a person's conduct caused public terror.  *See* 1 Hawkins, *supra*, at 134 (stating that affray is "publick Offense" and must result in "Terror of the People").  As

_____

[5]*See also, e.g.*, Mass. Gen. Laws, ch. 25, § 2 (I. Thomas & E. T. Andrews 1801) (Law Passed 1795); Mass. Gen. Laws, ch. 11, § 6 (T.B. Wait & Co. 1814) (Law Passed 1692); N.C. Acts & Laws, ch. 5, § 2 (Newbern 1751) (Law Passed 1741); N.H. Acts & Laws, ch. 1 (Daniel Fowle 1761) (Law Passed 1699); Va. Acts, ch. 49 (Dixon *et al.* 1786).

several contemporaneous commentators noted, "no wearing of Arms is within the meaning of this statute, unless it be accompanied with such Circumstances as are apt to terrify the People." 1 Hawkins, *supra*, at 136; *see also* Barlow, *supra*, at 12 (stating that bearing arms "if not accompanied with Circumstances of Terror, is not within this Statute"). In this case, there is no evidence or finding that Henderson's conduct caused public terror.

Second, at the founding, a going-armed affray required "evil intent or malice." *Bruen*, 597 U.S. at 43-44 (citing *Rex* v. *Sir John Knight*, 1 Comb. 38, 39, 90 Eng. Rep. 330, 330 (K. B. 1686)); *see also State v. Huntly*, 25 N.C. 418, 423 (1843) (noting that common-law going-armed affray requires "wicked purpose" and "mischievous result"). In this case, there is no evidence or finding that Henderson had a wicked or mischievous intent to terrify the public.

Third, a going-armed affray required "dangerous or unusual weapons." 4 Blackstone, *supra*, at 149; *see also* Barlow, *supra*, at 11-12; 1 Hawkins, *supra*, at 134-36. As founding-era commentators noted, "Persons of Quality are in no Danger of Offending against this Statute by wearing common Weapons" because, in those circumstances, it was clear that they had no "Intention to commit any Act of Violence or Disturbance of the Peace." 1 Hawkins, *supra*, at 136; *see also* Barlow, *supra*, at 12. The Supreme Court has recognized as much, stating, "The Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 544 U.S. at 627). The Supreme Court has stated the corollary that handguns "are, in fact, the quintessential self-defense weapon" and are "indisputably in common use for self-defense

today." *Id.* (quotations omitted). In this case, Henderson was lawfully carrying a pistol, a type of weapon "overwhelmingly chosen by American society" for self-defense. *See Heller*, 544 U.S. at 628. Possession of a weapon similar to Henderson's pistol would not have led to a similar restriction on the right to bear arms in the founding era.

Accordingly, the district court's revocation of Henderson's pistol permit restricts his Second Amendment rights "to an extent beyond what was done at the founding." *See Rahimi*, 602 U.S. at 692.

For these reasons, I would conclude that the district court violated Henderson's Second Amendment rights by granting Sheriff Leko's petition and revoking Henderson's permit to carry a pistol in a public place.